Charles Earl BRUBAKER, Appellant,

v.

Fred R. DICKSON, Warden of the California State Prison at San Quentin, California, Appellee.

No. 17583.

United States Court of Appeals Ninth Circuit.

Nov. 14, 1962.

Rehearing Denied Dec. 20, 1962.

Quentin Ogren, Benjamin Kagan, and Stanley E. Tobin, Los Angeles, Cal., Marshall W. Krause, San Francisco, Cal., for appellant.

Stanley Mosk, Atty. Gen. of California, John S. McInerny, Deputy Atty. Gen., and Arlo E. Smith, San Francisco, Cal., for appellee.

Before BARNES, JERTBERG and BROWNING, Circuit Judges.

BROWNING, Circuit Judge.

Appellant was convicted in the Superior Court of Los Angeles County of murder in the first degree. He was sentenced to death. After exhausting state remedies,[1] appellant filed a petition for habeas corpus in the District Court. That court denied the petition after oral argument. Appellant then filed an identical petition in this Court. We declined to entertain it, transferring the application back to the District Court for "hearing and determination."[2] The District Court again dismissed the petition on oral argument, rejecting affidavits offered by both sides and declining to receive further evidence.

## I.

Appellant alleged that he had been denied effective aid of counsel at his trial in the state court. He alleged that through lack of investigation and preparation his court-appointed trial counsel failed to discover and present substantial defenses which appellant had to the charge against him. These defenses were said to be (1) that at the time of the homicides appellant could not have had the specific intent required for first-degree murder; and (2) that certain confessions, which were the sole evidence of appellant's guilt,

---

1. The conviction was affirmed by the Supreme Court of California on direct appeal. People v. Brubaker, 53 Cal.2d 37, 346 P.2d 8 (1959). Appellant filed petitions for habeas corpus in the Marin County Superior Court and in the Supreme Court of California. They were denied without hearing. The order of the Supreme Court of California noted that Mr. Justice Peters was of the opinion that respondent should be ordered to show cause. A petition for certiorari to the Supreme Court of the United States was denied, the order noting that Mr. Justice Douglas was of the opinion that certiorari should be granted. Brubaker v. Dickson, 365 U.S. 824, 81 S.Ct. 703, 5 L.Ed.2d 702 (1961).

2. 28 U.S.C.A. § 2241(b).

were obtained in violation of his constitutional rights. He further alleged that trial counsel inexcusably failed to discover and present evidence in mitigation of sentence, although substantial evidence was available.

In the court below, the State took the position that the petition for habeas corpus "should be decided upon the basis of the Court's evaluation of the petitioner's allegations in the light of [the] record of the state court proceedings on file with this court." The District Court adopted this view, and declined to receive additional evidence. The court entered an order stating that it had examined the petition, the return, the traverse, and the transcripts of the state court proceedings, and that there was "nothing in the record" to sustain appellant's allegation that he had been denied effective aid of counsel.

■■ We note at the outset that appellant's allegations of fact outside the trial record must be considered in determining whether the petition alleged a denial of appellant's constitutional right to the effective aid of counsel.[3] A contrary rule would fall short of protecting this right. When inadequate representation is alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy.[4] If the petition, including appellant's allegations of fact outside the trial record, presents grounds which would entitle appellant to relief, he should be afforded an opportunity to support his allegations by proof.[5] With this in mind, we turn to the detailed allegations of the petition.

A. The factual allegations in support of a defense based upon appellant's men-

3. See Palmer v. Ashe, 342 U.S. 134, 137–138, 72 S.Ct. 191, 96 L.Ed. 154 (1951); Hawk v. Olson, 326 U.S. 271, 274–278, 66 S.Ct. 116, 90 L.Ed. 61 (1945); Jones v. Huff, 80 U.S.App.D.C. 254, 152 F.2d 14, 16 (1945). The adequacy of representation is properly tested by an examination limited to the trial record only when the question is presented on direct appeal. See generally 47 Colum.L.Rev. 115, 120–22 (1947). It has been suggested that limitation to the trial record is justified in federal habeas corpus proceedings involving state prisoners because the Fourteenth Amendment applies only to state action, and unless the inadequacy of representation was so obvious that the judge or prosecutor should have observed it and intervened, state action is lacking. The decisions cited in note 4 necessarily reject any such limited view of state responsibility for the fairness of the process by which the state deprives persons of life or liberty. In any event, in the present case trial counsel was an employee of the State. See Cal.Gov't Code §§ 27700–27711; 13 Stan.L.Rev. 522 (1961). See also Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61 (1945). "[T]he defender is a public official with the dignity of the state behind him." 45 Minn.L.Rev. 715, 721 (1961).

4. See, e. g., Luton v. Texas, 303 F.2d 899 (5th Cir. 1962) (holding that it was error to exclude evidence bearing upon the credibility of trial counsel as a witness called to explain his conduct of the defense); Turner v. Maryland, 303 F.2d 507 (4th Cir. 1962); United States ex rel. Tillery v. Cavell, 294 F.2d 12, 21–22 (3d Cir. 1961); Snider v. Cunningham, 292 F.2d 683 (4th Cir. 1961); Snider v. Smyth, 263 F.2d 372 (4th Cir. 1959); Williams v. Moore, 285 F.2d 590 (5th Cir. 1961); MacKenna v. Ellis, 280 F.2d 592 (5th Cir. 1960), modified 289 F.2d 928 (5th Cir. 1961); Lunce v. Dowd, 261 F.2d 351, 353 (7th Cir. 1958); Lunce v. Overlade, 244 F.2d 108, 74 A.L.R.2d 1384 (7th Cir. 1957).

5. Linden v. Dickson, 287 F.2d 55, 57–58 (9th Cir. 1961). There is no question here of deferring to a state court determination of the facts, since the state courts have not chosen to determine them; and neither we nor the District Court may defer to the state courts' resolution of the underlying issue of constitutional law. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Brown v. Allen, 344 U.S. 443, 506, 507–508, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

tal state when the crime was committed may be summarized as follows.

Electroencephalographic (EEG) examinations made subsequent to appellant's conviction revealed organic brain damage.[6] His prior medical history contained episodes of head injury and infantile illness from which the brain damage could have resulted;[7] there were no such incidents subsequent to the homicides. Medical opinion indicated that the damage was such as to render appellant "definitely seizure prone";[8] and was "of a type often associated with abnormal and otherwise unexplainable conduct."[9]

There was psychiatric opinion based upon post-conviction evaluations that appellant, while not "insane," had a compulsive personality marked by strong emotional instability.[10] There was substantial evidence of hypersensitivity to alcohol;[11] and the record established that immediately prior to the homicides appellant had drunk heavily.[12] There was competent medical opinion to support the view that, in the light of these and other factors, appellant was incapable of entertaining the specific intent required for first-degree murder at the time and in the circumstances of the homicides.[13]

6. The examinations were conducted by doctors at San Quentin Prison. A report of examination by that institution's Neuropsychiatric Committee stated, "His EEG shows abnormal tracings with localizing in the right temporal parietal area, where he has a scar from an old head injury in 1942, when he claims he was unconscious for 36 hours."

7. See note 6. The affidavit of appellant's mother confirmed both incidents. Affidavits of Dr. John J. Preisinger, Diplomate, American Board of Psychiatry and Neurology, supported the possible causal connection.

8. Dr. Yeager, Langley Porter Clinic, following latter's examination of appellant's EEG's, as quoted in the affidavit of one of appellant's present attorneys.

9. In reprieve granted May 15, 1960, by the Governor of California, as quoted in affidavit of one of appellant's present attorneys: "[E]lectroencephalographic [EEG] testing conducted by the Chief Psychiatrist at San Quentin [shows] that Brubaker has some organic brain damage of a type often associated with abnormal and otherwise unexplainable conduct."

10. The report of the San Quentin Prison Neuropsychiatric Committee stated, "We are agreed that his personality structure may best be described as a Passive-Aggressive Personalty with Emotional Instability, Neurotic and Dissociative Features with Overcompensatory Aggressive behavior." A psychological evaluation of appellant prepared by a San Quentin Prison clinical psychologist noted indications of "emotional lability and compulsive tendencies," and stated that under the stimulus of alcohol "he has a definite tendency to act-out in an hysterical, impulsive manner."

11. Affidavits of two of appellant's work supervisors over a five-year period, and of his landlady, his mother, and his wife, related incidents involving violence and loss of memory following consumption by appellant of relatively minor quantities of alcoholic beverages.

12. The confessions recited the consumption by appellant of a can of beer, two drinks of vodka, and close to an additional one-half pint of vodka, immediately before the homicides. The autopsy physician testified at trial that the alcohol blood content of the female victim, whom appellant matched "drink for drink," was above the level indicating intoxication. Also, appellant's affidavit stated that he had consumed additional substantial quantities of alcohol during the preceding twenty-four hours.

13. The affidavit of Dr. John J. Preisinger stated that even before the electroencephalogram was available "there was little doubt in my mind that Mr. Brubaker had organic brain disease which would affect his behavior while drinking," and concluded, "I do not see how he could form any intent to do wrong (with even vague responsibility) if he were drinking." The affidavit of one of appellant's present attorneys stated that he submitted the same documentary material that Dr. Preisinger had seen to Dr. Edward T. Colbert, of Santa Monica, California, and that Dr. Colbert "substantially corroborates the opinion of Dr. Preisinger," and was further of the opinion that at the time of the homicides "retreat was impossible for a person of petitioner's compulsive and unstable psychic makeup."

The affidavit of Dr. Bernard L. Diamond, member of the American Psychiatric Association and author in forensic psychiatry, expressed the view that

B. The following factual allegations were made in support of the inadmissibility of the confessions.

Appellant was arrested on a Tuesday evening. He was taken to the police station and booked. He told the arresting officers he wished to contact an attorney; they said he could get his attorney "later." He repeated this request twice more in the course of the evening. The requests were denied. The following morning he again asked to see his attorney; the officers said, "You'll see him." [14]

Appellant was questioned briefly the evening of his arrest. The following day he was subjected to lie detector tests and questioned intermittently from about 9:00 a. m. until about 2:30 in the afternoon when he first confessed. This confession, much longer than those subsequently taken, was recorded, but was later destroyed and was not introduced at trial. After further questioning, a typewritten statement was prepared which appellant signed and which was introduced at trial. The questioning resumed the following day. A tape-recorded confession taken that afternoon was also introduced at trial.

At the time of his arrest appellant was employed as a service station attendant. He had a tenth grade education, having failed the eleventh grade. He was thirty-nine years old. As noted, his personality was characterized by "emotional instability" and "neurotic and dissociative features." [15] He did not know of his right to remain silent when questioned by the police. The officers did not advise him of his right; he was told that his interest lay in telling them his story fully and accurately before trial.[16]

From the final refusal of his request to contact a lawyer, appellant inferred that he would not be permitted to see a lawyer until he confessed. Before he confessed, one of the officers told him they had "other ways" to make him talk, which appellant took as a threat of violence. Appellant states that he confessed in fear, and in ignorance of his rights; that he had no clear recollection of the critical events surrounding the commission of the crime, and that the details which appear in the recorded confessions were suggested to him by the officers as the way things must have happened.[17]

existing data indicated the desirability of further examination of appellant to determine his mental state at the time of the homicides. Dr. A. A. Marinacci, head of the Departments of Electroencephalography, Los Angeles County General Hospital, University of Southern California, and Good Samaritan Hospital, Los Angeles, agreed to examine appellant's electroencephalograms. Appellant's present attorney sought but was denied the opportunity to arrange for such examinations.

14. A memorandum prepared by a Deputy Public Defender following an interview with appellant shortly after his arraignment contained the notation, "Says denied atty at 1st." Affidavits of the two arresting officers "lodged" with the District Court but not accepted for filing, acknowledged a conversation with appellant regarding an attorney, although denying that he requested permission to telephone counsel.

15. See note 10.

16. Nothing in the confessions or elsewhere in the record indicates that appellant

knew or was advised of his constitutional rights. The following excerpts from the tape-recorded confession reflect the substance of the advice given appellant by the officers: "It's much better for you if you are going to find you told something wrong to tell us now than it is to wait until we get in court, and meanwhile have us find out, and possibly get proof that something you told us was not right. * * * If you can think of anything important to this case, tell us about it now. Because we don't want to go to court and prove you a liar. * * * If there's anything that you can straighten out now, you straighten it out in your story, and we won't have to go to court later and prove that this happened and you didn't tell us about it."

17. The affidavit of a plant superintendent under whom appellant had worked was offered to support appellant's tendency to amnesia while intoxicated, followed by invention of details lost to memory. The affidavit of Dr. John J. Preisinger stated, "This phenomenon of confabulation is frequently found in patients who are alcoholics or who suffer brain damage."

**C.** The factual allegations in support of the contention that trial counsel failed to investigate and present appellant's defenses were as follows.

Appellant's trial counsel, a Deputy Public Defender, was appointed shortly after arraignment. Appellant told trial counsel that he knew nothing of the law, and placed himself entirely in trial counsel's hands.[18] Trial counsel initially recommended to appellant that he plead guilty. In the three-and-a-half months between arraignment and trial, trial counsel saw appellant on three occasions for a total of about an hour. Two of the conferences were devoted largely to matters other than appellant's defense.[19]

Trial counsel was aware of appellant's history of head injury and extended unconsciousness and of the heavy drinking that occurred on the night of the homicide.[20] Nonetheless, he made no effort to elicit appellant's personal history, made no inquiries of appellant's family, friends or employers (although furnished the names by appellant),[21] and failed to arrange a private examination of appellant by an independent psychiatrist (although funds were available for that purpose), because he mistakenly supposed that the communications would not be privileged.[22] Trial counsel was told of the circumstances surrounding the taking of the confessions, including the refusal of appellant's prior requests for access to counsel,[23] but he did not pursue the matter.[24] Trial counsel did not exercise his right to obtain a copy of the initial recorded interrogation of appellant by the police, since destroyed, although it contained material of value to the defense.[25]

18. In an affidavit lodged with the District Court but not received for filing, trial counsel stated that appellant "placed his trust completely in me—more than once he said to me, 'I don't know anything about the law. I'll do whatever you say.'" The affidavit continued, "I never had any occasion to talk with Mr. Brubaker about what his rights might be and how he could exercise them if he was not satisfied with my representation of him. The occasion never arose for me to talk with Mr. Brubaker along these lines because he was so thoroughly cooperative."

19. It is alleged that the first conference concerned the necessity of seeking a continuance because of counsel's commitments on other cases, and that the second was devoted largely to explaining to appellant and his mother that counsel was abandoning a defense of insanity because of the report of the court-appointed psychiatrist (see note 20), and that they should be prepared for the death penalty. The affidavit of appellant's mother confirmed the latter conversation in part.

20. Appellant was examined by a court-appointed psychiatrist prior to the appointment of trial counsel. The letter report of this psychiatrist to the court found no evidence of mental illness, but recited appellant's history of head injury and extended unconsciousness, and a statement by appellant that his recollection of the crucial events was in "some parts * * * clouded up.' (Letter from Dr. McNiel to Judge Nye, Oct. 2, 1958.) Trial counsel's affidavit and the trial transcript indicated that he was aware of the contents of the confessions later introduced at trial which recited in detail the drinking that occurred immediately prior to the homicides.

21. Supported in part by affidavit of one of appellant's present counsel that certain witnesses interviewed by him stated specifically that they were not contacted by trial counsel.

22. The affidavit of one of appellant's present counsel recited conversation with trial counsel to this effect. Present counsel cite In re Ochse, 38 Cal.2d 230, 238 P. 2d 561 (1951), as establishing that under California law such communications are within the attorney-client privilege and as such are protected from disclosure.

23. See note 14.

24. Trial counsel's affidavit states, "I probably told [appellant] * * * that I thought it would be a futile act to object to the introduction of the confessions into evidence."

25. Present counsel argue that this initial recording, concededly much more extensive than the later confessions introduced in trial, would have supported appellant's assertions that he was encouraged in the mistaken belief that he had no right to remain silent and his interest lay in full pretrial disclosure, that he was threatened,. and that the details in the later confessions originated with the officers and were suggested to appellant, and would also have reflected appellant's confusion and remorse.

The only evidence offered at trial to prove appellant's commission of the homicides was appellant's two confessions, but trial counsel made no effort to exclude them, announcing "no objections" to the admission of the first, and stipulating to the admission of the second. When the State rested, appellant's trial counsel approached the bench with appellant, stating that he did not intend to put appellant on the stand and "would like an expression of consent or lack of consent for the record at this time." Appellant consented. Trial counsel then rested for the defense, calling no witnesses as to appellant's mental condition or any other matter. Trial counsel did not consult with appellant during the trial or between court sessions.[26]

Trial counsel argued in summation that appellant lacked the necessary intent for first-degree murder, relying entirely upon the immediate details of the crime as indicated in the confessions, and by the physical circumstances. None of the facts and contentions summarized above relating to the admissibility of the confessions and the bearing of appellant's mental condition and intoxication upon the issue of specific intent was presented to the court or jury either through cross-examination, by affirmative evidence, or in argument.

The separate hearing on penalty required by California law[27] was scheduled to be held four days following appellant's conviction. The California statute provides that "Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty."[28] Appellant's trial counsel had assumed from the outset that a first-degree conviction was probable,[29] yet he made no preparation for the penalty hearing. He did not see appellant during the four days between verdict and hearing. As the hearing was about to convene he spoke with appellant for five minutes, telling him that he "ought not to be disappointed" if he received a death sentence.

The State offered evidence in aggravation of the penalty.[30] Appellant's trial counsel offered none in mitigation. When the State rested, appellant's counsel approached the bench with appellant, stating, "I would like the record to show that I have advised the defendant that, in my opinion, we have no evidence which would be of assistance to him in mitigation, and for that reason, I have recommended that he not testify." Appellant was asked to state for the record that counsel had so advised him and that he did not wish to testify; he responded, "That's correct." Trial counsel then rested. Substantial affirmative evidence in mitigation could have been secured by reasonable diligence,[31] but none was introduced because,

26. The trial continued over portions of three days.

27. California statutes provide that every person guilty of murder in the first degree shall suffer death or life imprisonment, and that the choice shall be made by the trier of fact in a separate proceeding following the determination of guilt. Cal.Pen.Code §§ 190, 190.1.

28. Cal.Pen.Code § 190.1.

29. See note 19.

30. Trial counsel said he did not know what evidence the State intended to offer, though the principal witness was a cousin of appellant's wife. The hearing was delayed to permit trial counsel to examine the State's exhibits reflecting appellant's prior record, which trial counsel said he had not seen.

31. As evidence relevant to mitigation, appellant's present counsel pointed to material relating to appellant's organic brain damage, compulsive and unstable personality, and hypersensitivity to alcohol; his background and personal history: the deformities, illnesses and insecurities of his childhood, the absence from his record of any prior convictions of felony or of assaultive crimes, and the reputation which he bore among his work supervisors, fellow employees, friends and neighbors. Illustrative of supporting affidavits in the latter category was that of a plant superintendent under whom appellant worked continuously for four years: "Charlie Brubaker has been a very good friend of mine and has been out to my house many times. * * * He was a gentleman at all times and always thoughtful. * * * To kill someone was

as trial counsel stated, he was not aware that any was available.

Trial counsel's summation challenging particulars of the State's argument in aggravation of sentence could only have prejudiced appellant. The prosecution argued that appellant was "a madman, a sex fiend"; trial counsel responded that "there is not one iota of evidence concerning this man's mental condition. * * * He is presumed to be sane." The prosecutor argued that appellant had shown no remorse; trial counsel responded that, although appellant had "concededly lied" when first questioned, he had then determined to tell the truth, though perhaps this decision was "self serving" and reached "only * * * because he thought it would help him," and the jury should consider the fact that he had cooperated.

## II.

■■ The test to be applied in determining the legal adequacy of the allegations of appellant's petition is readily stated: "The requirement of the Fourteenth Amendment is for a fair trial"; [32] the due process clause "prohibits the conviction and incarceration of one whose

trial is offensive to the common and fundamental ideas of fairness and right." [33] Compliance with this standard required that appellant, charged with a capital offense, be represented at trial by counsel.[34]

■ But the constitutional requirement of representation at trial is one of substance, not of form. It could not be satisfied by a pro forma or token appearance.[35] Appellant was entitled to "effective aid in the preparation and trial of the case." [36]

■■ This does not mean that trial counsel's every mistake in judgment, error in trial strategy, or misconception of law would deprive an accused of a constitutional right.[37] Due process does not require "errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." [38] Determining whether the demands of due process were met in such a case as this requires a decision as to whether "upon the whole course of the proceedings," and in all the attending circumstances, there was a denial of fundamental fairness; [39] it is inevitably a question of judgment and degree.

just not like him. * * * He is a very fine boy. * * * He was very good as a worker—one of the fastest men I had. * * * I know * * * that when he drinks, he just goes out of his head—just one can of beer and he doesn't even know his own name. * * * Charlie never hurt anybody he ever worked with. He was a friendly person who never intended any harm to anyone. He used to go around and take up a collection for anyone in our shop who was in trouble and his own two bucks would go into the hat first."

32. Massey v. Moore, 348 U.S. 105, 108, 75 S.Ct. 145, 147, 99 L.Ed. 135 (1954).

33. Betts v. Brady, 316 U.S. 455, 473, 62 S.Ct. 1252, 1262, 86 L.Ed. 1595 (1942).

34. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

35. Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Holly v. Smyth, 280 F.2d 536, 542 (4th Cir. 1960), and cases cited.

36. Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932). See Reece v. Georgia, 350 U.S. 85, 90, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Hawk v. Olson, 326 U.S. 271, 274, 66 S. Ct. 116, 90 L.Ed. 61 (1945); Turner v. Maryland, 303 F.2d 507, 511 (4th Cir. 1962). Cf. Mays v. United States, 216 F.2d 186 (10th Cir. 1954); Wheatley v. United States, 198 F.2d 325 (10th Cir. 1952).

37. Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955); Lunce v. Dowd, 261 F.2d 351, 353–354 (7th Cir. 1958).

38. MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960), modified 289 F.2d 928 (5th Cir. 1961).

39. Malinski v. New York, 324 U.S. 401, 416, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945) (concurring opinion); Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). "What due process requires in one situation may not be required in another, and this, of course, because the least change of circumstances

38

From the allegations of the petition, the defenses available but not presented by trial counsel appear to have been substantial.

■■ Under California law "on the trial of the issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence that because of mental abnormality not amounting to legal insanity defendant did not possess the essential specific mental state is admissible." Such evidence "is received not as a 'complete defense' negating capacity to commit any crime but as a 'partial defense' negating specific mental state essential to a particular crime." [40] Evidence as to appellant's mental state was also relevant to the question of penalty, and might well have been persuasive.[41]

■ The allegations of the petition made out a prima facie case for the excludability of appellant's confessions under the rule announced in Crooker v. California,[42] apart from whether appellant's "will was overborne." [43] As the court stated the rule in Crooker, "state refusal of a request to engage counsel violates due process * * * if [the accused] is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.' " [44] And as we held in Griffith v. Rhay, such prejudice

is shown if from all the circumstances it appears that "it could not reasonably be inferred that [the accused] understood that he had the right to remain silent," that counsel "would probably * * * have advised [the accused] to refuse to talk," and that the statement given by the accused in the absence of advice of counsel was of a character clearly contrary to the accused interests.[45] The allegations of the present petition met this test.

■ Facts are alleged from which it would appear that these potential defenses would have suggested themselves to a reasonably diligent trial counsel. The defense actually tendered was so insubstantial in relation to those not offered as to cast doubt upon the hypothesis that trial counsel made a deliberate informed choice.[46] The failure of trial counsel to contact obvious witnesses lends further credence to the allegation that counsel did not undertake the investigation and research essential to adequate trial presentation. In any event, it would not seem proper to dispose of so substantial a showing "by a resort to speculation and surmise" [47] as to possible explanations for trial counsel's inaction.

Upon an examination of the whole record, we conclude that appellant alleged a combination of circumstances, not refuted by the record, which, if true, precluded the presentation of his available defenses to the court and the jury through no

may provide or eliminate fundamental fairness." Crooker v. California, 357 U.S. 433, 441 n. 6, 78 S.Ct. 1287, 1292, 2 L. Ed.2d 1448 (1958).

40. People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492, 498-499 (1959), and authorities cited; People v. Wells, 33 Cal.2d 330, 202 P.2d 53, 61-70 (1949).

41. This is also true of the evidence relating to appellant's background and personal history. See note 31.

42. 357 U.S. 433, 78 S.Ct. 1287 (1958).

43. See Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). See also Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

44. 357 U.S. at 439, 78 S.Ct. at 1292.

45. 282 F.2d 711, 717 (9th Cir. 1960).

46. It is difficult to credit the suggestion, for example, that trial counsel deliberately chose to stipulate to the admission of confessions which were the sole evidence of appellant's guilt and which were at least arguably excludable under the rule announced in Crooker, on the theory that it would be better strategy to invoke the sympathy of the jury by a display of candor, especially since under California procedure the objection to the confessions could have been submitted initially to the court out of the presence of the jury.

47. Palmer v. Ashe, 342 U.S. 134, 137, 72 S.Ct. 191, 193, 96 L.Ed. 154 (1951).

fault of his own, and thus rendered his trial fundamentally unfair. Appellant does not complain that after investigation and research trial counsel made decisions of tactics and strategy injurious to appellant's cause; the allegation is rather that trial counsel failed to prepare, and that appellant's defense was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all.[48]  The omissions alleged by appellant "were not mere mistakes of counsel or errors in the course of the trial. If true, they constituted a total failure to present the cause of the accused in any fundamental respect. Such a proceeding would not constitute for the accused the fair trial contemplated by the due process clause * * *."[49] It follows that appellant must have an opportunity to support the allegations of his petition, by proof, in a hearing before the District Court.[50]

It should be noted that none of the reasons which have sometimes prompted denial of a factual hearing on allegations of inadequate representation by counsel[51] are present in this case. The ease with which plausible but unfounded allegations may be made against trial counsel, the temptation of the convicted to blame their attorneys rather than themselves, and the weakness of the threat of perjury against those confined in prison or facing execution did not contribute to the allegations of this petition which was prepared and carefully documented by responsible counsel. The reputation of the Office of the Public Defender of Los Angeles County and of trial counsel in this case negated any possibility that available defenses were deliberately withheld to win delay and give accused two chances to prevail. The stresses imposed upon state-federal relations by differing determinations of the same factual issues[52] could not arise here, for no state court had considered the factual issues which the federal District Court will now determine for the first time on remand.

### III.

Appellant's petition also asserted that appellant's conviction was constitutionally invalid solely because of the admission of the confessions, and independently of the infirmity arising from the lack of effective assistance of trial counsel.

As we have said, the allegations of the petition made a prima facie showing that the confessions were obtained in such circumstances that a conviction based upon them would violate due process. The State urges, however, that because appellant's trial counsel failed to object to the admission of the confessions at trial, appellant may not raise this question in a habeas corpus proceeding.

An accused is normally bound in subsequent habeas corpus proceedings by the act of his counsel in waiving a constitutional right during trial,[53] but this is

48. "Pro forma entry of an appearance without study or preparation for useful participation in the trial is not a satisfaction of the constitutional rights of an accused." Turner v. Maryland, 303 F.2d 507, 511 (4th Cir. 1962). The importance of reasonable investigation and preparation in determining whether challenged representation meets constitutional standards was emphasized by the court in Powell. v. Alabama, 287 U.S. 45, 57–58, 53 S.Ct. 55, 77 L.Ed. 158 (1932). See also Jones v. Cunningham, 297 F.2d 851, 855 (4th Cir. 1962); MacKenna v. Ellis, 280 F.2d 592, 601–604 (5th Cir. 1960); Kyle v. United States, 263 F.2d 657 (9th Cir. 1959); Tucker v. United States, 235 F.2d 238 (9th Cir. 1956);

Johnson v. United States, 71 App.D.C. 400, 110 F.2d 562 (1940).

49. Jones v. Huff, 80 U.S.App.D.C. 254, 152 F.2d 14, 15 (1945).

50. Linden v. Dickson, 287 F.2d 55, 57–58 (9th Cir. 1961).

51. 4 U.C.L.A. L.Rev. 400, 402–03 (1957); Fellman, The Defendant's Rights 124–25 (1958).

52. See generally 68 Yale L.J. 98, 101 (1958).

53. See United States ex rel. Reid v. Richmond, 295 F.2d 83 (2d Cir. 1961). See also Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); Hamilton v. Alabama, 368 U.S. 52, 54, 82 S.Ct.

not invariably true.[54] The issue of whether the confessions were obtained in violation of appellant's constitutional rights, and, if so, whether appellant was bound by his trial counsel's consent to their admission, raises questions of fact and law inseparable from those involved in determining whether appellant was afforded effective aid of counsel. Since it is unlikely that on remand the former issue will be presented as an independent ground of decision, we believe it wise to withhold consideration of the problem at this time.

Remanded for further proceedings.

157, 7 L.Ed.2d 114 (1961); Whitley v. Steiner, 293 F.2d 895 (4th Cir. 1961).

54. See, e. g., United States ex rel. Scals v. Wiman, 304 F.2d 53, 67–69 (5th Cir. 1962); United States ex rel. Noia v. Fay, 300 F.2d 345 (2d Cir.), cert. granted 369 U.S. 869, 82 S.Ct. 1140, 8 L.Ed.2d 274 (1962), 62 Colum.L.Rev. 1077 (1962); United States ex rel. Goldsby v. Harpole, 263 F.2d 71 (5th Cir. 1959). Cf. Massey v. Moore, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135 (1954); Brown v. Allen, 344 U.S. 443, 503, 73 S.Ct. 397, 97 L.Ed. 469 (1953). See also Snider v. Cunningham, 292 F.2d 683 (4th Cir. 1961); Snider v. Smyth, 263 F.2d 372 (4th Cir. 1959).

For general discussion of the effect of "waiver" in state proceedings upon the availability of federal habeas corpus, see 7 Utah L.Rev. 423 (1961); 74 Harv. L.Rev. 1315 (1961); 61 Colum.L.Rev. 255 (1961).