**UNITED STATES of America,**
**Respondent,**

v.

**Alfredo Delgado ARELLANES,**
**Petitioner.**

**No. 37838.**

United States District Court
N. D. California, S. D.

Nov. 25, 1964.

Cecil Poole, U. S. Atty., Jerrold Ladar, Asst. U. S. Atty., appearing, for respondent.

Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., Garrett Graham, San Francisco, Cal., appearing, for petitioner.

WOLLENBERG, District Judge.

The Court of Appeals for the Ninth Circuit remanded to this Court for fur-

ther proceedings petitioner's motion, under 28 U.S.C. § 2255, to vacate and set aside a sentence for violation of the Jones-Miller Narcotics Act. Arellanes v. United States, 9 Cir., 326 F.2d 560. Counsel, appointed by this Court for the purpose, diligently and ably presented petitioner's case at the full evidentiary hearing held pursuant to instructions of the appellate court.[1]

█ In a previous opinion, on the record then before it, the Court of Appeals for the Ninth Circuit affirmed petitioner's conviction. Arellanes v. United States, 302 F.2d 603. This Court is bound by that decision and any variance from the conclusions reached therein must be based on a reading of the original record in the light of evidence introduced at the § 2255 hearing.

The facts developed at the § 2255 hearing that were not contained in the original record are as follows:

Shortly following petitioner's arrest[2] certain members of his family paid a Los Angeles attorney to go to San Francisco, where petitioner was incarcerated, to investigate the circumstances of his case. The attorney came to San Francisco and made such an investigation. He then returned to Los Angeles and told the family members that petitioner's situation was practically hopeless in that the case against him was very strong and it was very likely he would have to serve a considerable sentence, perhaps as long as fifty to eighty years.

At this point there is a conflict in the evidence. Members of the Arellanes family testify that the attorney told them the only chance for petitioner was to negotiate a favorable "deal" with the prosecution by means of bribing the Bureau of Narcotics agent in charge of the investigation. According to their testimony, the attorney then requested $3,000 with which to bribe the narcotics agent. The attorney testified, however, that the $3,000 was for his legal services in representing petitioner. This Court is inclined to believe that the attorney at least implied to the family, in order to induce them to put up the $3,000, that because of his special "contacts" he could provide helpful services, albeit illegal, which would enhance the possibility that petitioner would get off with a relatively light sentence. Most likely these implications were in the form of "puffing" the worth of his services rather than an out and out offer to participate in a conspiracy to bribe. However, it seems clear that the payment of the $3,000 was agreed to by the family in the belief that the money would be used to "pay-off" the narcotics agent and that a "fix" would be arranged.

At any rate, the attorney undertook to represent petitioner and petitioner acquiesced in such representation. In the weeks that followed, prior to the trial, the attorney engaged in conversations with Bureau of Narcotics agents and with the U. S. Attorney's office in an attempt to negotiate a plea of guilty. Whether at first petitioner was aware of the supposed illegal "arrangement" between the attorney and his family is not clear. It is clear that he was in-

---

1. Judge Chambers, concurring in Arellanes v. United States, 326 F.2d 560, 561, indicated a hope that before being brought back to court petitioner would be deposed "to see how well the conclusory allegations hold up." Preliminary investigation by the court appointed attorney accomplished this purpose. Judge Chambers also hoped that if the charges against former counsel proved to be untrue "something [would] be done about it." As it turns out the charges proved to be sufficiently truthful as to cause this Court to ask the U. S. Attorney to look into the matter for possible criminal violations by all concerned, including members of the Arellanes family.

2. To simplify the story no mention is made here of petitioner's wife. She was arrested and convicted along with him, but her conviction was reversed on appeal. Part of petitioner's motivation in his actions prior to and during the trial was undoubtedly concern for what would happen to his wife. However, motive is relevant herein only as an aid to determine intent. Petitioner's concern for his wife has been taken into account in the Court's finding of facts in regard to his state of mind.

formed of it several weeks before the trial. It is also not clear how much actual trial preparation the attorney did. It is certain that he elicited sufficient facts from petitioner to satisfy himself that there were no plausible legal defenses. However, it is not likely that either petitioner or his attorney often brought up the subject of legal defenses during their consultations. The attorney was convinced that there were no defenses and his major task was to connive somehow, whether legally or illegally, for a favorable guilty plea. Petitioner, on the other hand, was perfectly aware of his guilt, did not believe there was any legal way to improve his situation short of becoming a government informant, and fully desired to encourage his attorney to carry out the illegal scheme to help him.

Time went by and things did not work out for either petitioner or his attorney. At no time did the attorney attempt to utilize any illegal means to "fix" the case. Negotiations with the prosecution broke down when petitioner refused to divulge names of his suppliers. As the day set for trial drew near petitioner became worried and impatient. He attempted to contact another attorney, Edward Cragen, whom, according to newspaper accounts available to him, was engaged in defending a client accused of attempting to bribe the very same narcotics agent his own attorney supposedly was attempting to bribe. Petitioner told Cragen during the course of a brief conversation at the county jail, wherein he was incarcerated, that his own attorney was attempting to arrange a "fix". When Cragen scoffed at the possibility and warned him of the consequences petitioner, by now beginning to have his own doubts, inquired about securing Cragen's services.

Whether petitioner wanted Cragen's services because he wanted better legal representation or because he believed there was some possibility that Cragen might be able to negotiate a "fix" is problematical. At any rate, petitioner was unable to pay Cragen a retainer and without such payment Cragen was unwilling to discuss the matter of representation further. There is some evidence that petitioner made at least one other half-hearted attempt to secure other counsel. At no time, however, prior to the trial date did he exercise his prerogative to discharge his attorney and request substitute counsel.

The trial was originally set for April 17, 1961. By various maneuvers continuances were secured until finally it was set for Monday, May 15, 1961. On Sunday, May 14, petitioner and his attorney discussed trial strategy. For some reason, petitioner desired another continuance. Petitioner's testimony is that his attorney told him he would get one even if the attorney had to stage a false heart attack. During the course of the Sunday discussion, petitioner further testified, the attorney outlined a cogent defense strategy, for use in the event a continuance was not granted.

In fact, a continuance was not secured and the case was assigned to this Court for trial on May 15. Following the attorney's refusal to stage a heart attack, and the empanelling of a jury, petitioner sought to discharge him. Petitioner represented to the Court that differences in defense strategy had developed between himself and his attorney.

After a one day continuance and a request from the attorney that he be relieved from the case, this Court required petitioner to proceed forthwith to trial. Petitioner's request for a further continuance to secure substitute counsel was denied and on his insistence, this Court permitted the attorney to withdraw. Petitioner then proceeded without counsel. The denial of a further continuance by this Court, as well as the propriety of the ensuing trial was upheld by the Court of Appeals, on the basis of the original trial record, Arellanes v. United States, 302 F.2d 603.

The legal question that now must be decided is whether in the light of the additional facts developed in the § 2255 hearing petitioner's constitutional right to counsel was in fact violated. In its

opinion ordering the § 2255 hearing, Arellanes v. United States, 326 F.2d 560, the Court of Appeals specified that in order to determine the constitutional adequacy of counsel the standards delineated in Brubaker v. Dickson, 9 Cir., 310 F.2d 30, 37 should be applied. The Brubaker test of constitutional adequacy of counsel, as this Court reads it, requires a decision as to whether in the light of "all the attending circumstances, there was a denial of fundamental fairness; it is inevitably a question of judgment and degree." Ibid.

Whether there was "fundamental fairness" in this case is dependent on the resolution of the following issues delineated by the Court of Appeals when it remanded the case here for further proceedings. Arellanes v. United States, 326 F.2d 560.

1. *Did petitioner's attorney totally fail to prepare for trial?*

The uncontradicted testimony is that the attorney did confer with his client as to the facts and on the basis of what he was told reached the conclusion that there was no plausible defense. Moreover, when it seemed that there was no alternative to going to trial, he outlined to his client a legally sufficient trial strategy. This strategy was in fact adopted by petitioner during the trial.

2. *Did the attorney secure funds from petitioner and his family by fraudulent and extortionate means in order to buy dismissal of the charges?*

The testimony is in sharp conflict so far as the relationship between the attorney and petitioner's family is concerned. Very likely there was misrepresentation by the attorney. However, with regard to petitioner, his testimony is that he never really believed the attorney's story regarding a bribe, that he thought this was just a means being used by the attorney to obtain a fee. In other words, petitioner was not misled by the attorney. In fact, by not divulging his doubts about the attorney to his family, petitioner contributed to their deception. If he did not believe the attorney's bribe story he must have had some reason for not exposing the attorney to the family. The only reason this Court can discern was that petitioner regarded the attorney's services as valuable to him, despite any doubts about the "fix".

At any rate, the attorney did not secure any funds from petitioner. In fact, petitioner himself attempted to and did secure some of the family funds intended for the attorney for his own use.

3. *Was petitioner capricious in delaying discharge of the attorney until trial had commenced?*

In a legal sense, petitioner's discharge of his attorney was capricious. Petitioner did not believe he had a valid defense when the trial commenced. He had no reason to believe that his attorney was not competent to handle his defense, such as it might be. He had no cause for believing that a different attorney could present a better legal defense. Finally, at the point he discharged his attorney, he was well aware that he would have to proceed without an attorney. He had no reason to believe that he could represent himself better than the attorney could.[3]

However, if by capricious, one means that petitioner did not have at least one good reason for discharging his attorney, then petitioner's act may not have been capricious. Petitioner could have, and probably did have, the belief that there was nothing to lose by defending himself since he had no valid defense. On the other hand, he had been informed that chances of reversal on appeal were greatly enhanced where the defendant represented himself.[4]

In fact, the timing of petitioner's discharge of his attorney leads one to the conclusion he had carefully plotted it to ensure that he would not be represented. At any rate, although he testifies he had completely lost confidence in his counsel

3. See Transcript, May 15, 1961, page 23, lines 10–14.

4. See Trial Transcript, pp. 187–188.

weeks before the trial the only verified effort he made to consult other counsel (Cragen) was very ambiguous in its implications in that much of his conversation with Cragen concerned the possibility of the success of an effort to bribe one of the government agents.

4. *Was defendant's failure to inform the trial court of the facts concerning the attorney's conduct such a deception as to amount to an election to proceed without counsel?*

At every step of the way petitioner attempted to deceive the court. He approved of a supposed effort to bribe the prosecution. He connived at securing continuances on specious grounds. He attempted to incite his attorney to have a false heart attack in court. He lied to the Court about his reason for discharging his attorney.

The Court of Appeals suggests that the "colloquy between court and counsel was such that [petitioner] may have read from it a discouragement of any explanation as to the precise nature of his complaint." Arellanes v. United States, 326 F.2d 560, 561. Since the precise complaint of petitioner was in fact that the attorney had not carried out his end of an illegal bargain, the simple explanation of petitioner's silence is that he had no desire to compound his difficulties by admitting complicity in an additional criminal act. However, even if petitioner's complaint really was that his attorney had not properly prepared the case there is nothing in the record which would indicate that this Court discouraged him from divulging that fact.

The only possible question arising from the colloquy between petitioner and the court was whether petitioner was ever made aware of the fact that he had a right to request a court appointed at-

torney. Even if he was not aware of that fact his right to counsel was not violated because his conduct must be regarded as a waiver of that right. Since he deliberately delayed discharging his attorney until commencement of the trial he had created a situation where he would have had to proceed either without counsel or with wholly unprepared counsel. Under such circumstances, as the Court of Appeals has indicated, Arellanes v. United States, 302 F.2d 603, 610, petitioner's conduct can be regarded as a waiver of counsel.

Conceivably, if petitioner had been ignorant of the fact that indigents can secure court appointed counsel, an argument could be made that petitioner had become so overwhelmed with the hopelessness of his situation and of any aid from the court that he could have been shocked into silence. But this was not the case. Petitioner was and is highly intelligent and articulate. He had had much previous experience with legal processes. He was aware that court appointed counsel was possible.[5] His grasp of what is legally significant and how one must handle himself in a courtroom is clearly shown in his conduct of his defense at the original trial and in his presence of mind under cross-examination during the § 2255 hearing.

Under these circumstances the conclusion is inescapable that he elected voluntarily to proceed without counsel. The circumstances of this election were such as to amount to a waiver of the right to be represented by counsel.

Petitioner's present counsel, appointed by the court for purposes of the § 2255 hearing, raises issues regarding the lawfulness of the arrest, the search and seizure, the "recidivist hearing", the indictment and the failure to advise as

---

5. See the affidavit of petitioner's sister-in-law, Cruz P. Carillo, filed March 18, 1963. In pertinent part it reads: "On or about May 15, 1961, after the afternoon court hearing before U.S. District Judge Albert C. Wollenberg, throughout which hearing I was present, at which time Judge Wollenberg said in part 'I

can't appoint anybody else to do that at this late hour' [sic] Mr. Arellanes said to me and Geneva Arellanes that from the Judge's statement of not being able to 'appoint anybody else' it seemed like they weren't *even* entitled to a court-appointed attorney." (Emphasis added).

to self-incrimination. These issues were raised by the original record on appeal and on the basis of that record the Court of Appeals affirmed the conviction. In fact, this Court has again considered them because of the possibility that the record of the § 2255 hearing would cast the facts in the original record in a new light. This reconsideration discloses no reason to suppose that the Court of Appeals affirmance of the conviction of petitioner is not binding on this Court.

Accordingly, petitioner's motion to vacate and set aside his sentence for violation of the Jones-Miller Narcotics Act must be and hereby is denied.