[Crim. No. 6754. Third Dist. Feb. 26, 1974.]

In re TOMY ISUKI HWAMEI on Habeas Corpus.

[Crim. No. 6698. Third Dist. Feb. 26, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMY ISUKI HWAMEI, Defendant and Appellant.

**COUNSEL**

Keogh, Marer & Flicker and Gerald Z. Marer for Petitioner and for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Jack R. Winkler and Herbert L. Ashby, Chief Assistant Attorneys General, William E. James and Doris H. Maier, Assistant Attorneys General, Arnold O. Overoye, Nelson P. Kempsky, Eddie T. Keller and Charles P. Just, Deputy Attorneys General, for Respondent and for Plaintiff and Respondent.

## OPINION

**REGAN, J.**—An indictment was filed on October 29, 1969, charging defendant Tomy Isuki Hwamei, also known as Baltazar Garcia Estolas, with the murder of Pellegrino Chiari (count I); with the murder of Giosue Mariani (count II); armed robbery while armed with a deadly weapon (count III); kidnaping to commit robbery of Lydia Reynaga (count IV); kidnaping to commit robbery of Ramona Reynaga (count V); assault with a deadly weapon with intent to commit murder upon Fernando Moreno (count VI); assault with a deadly weapon with intent to commit murder upon Teresa Vizcarra (count VII). After a trial by jury, defendant was found guilty on all seven counts. Following presentation of evidence on the penalty issue, the jury assessed the death penalty as to counts I and II. On March 31, 1970, the sentence of death was imposed.

Defendant's automatic appeal to the Supreme Court was transferred to this court after the decision in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], which held the death penalty to be unconstitutional.

Prior to oral argument, defendant filed a petition for writ of habeas corpus. This petition was consolidated with the appeal for purposes of the hearing and the matters were argued on October 18, 1972. We issued an order to show cause limited to (1) the claim of denial of effective representation and (2) the claim of suppression of evidence.[1]

On February 21, 1973, the cause was again called and argued. Troubled by the possible failure of counsel to thoroughly investigate the defenses of diminished capacity or insanity,[2] this court decided to seek an objective

---

[1]After an examination of the record we are convinced that this latter claim is without substance. We therefore reject the contention that the prosecution suppressed evidence.

[2]Defendant, in his petition, had set forth much documentary evidence tending to show that there was a history of mental illness in his background. The affidavits and other documentary evidence, not in the hands of the defense at the time of trial, can be summarized as follows: As a young child and young man, he had a history of mental delusions and strange behavior and was treated for such by a physician; his Filipino wife was the subject of beatings and ran away from home several times because of his abnormal behavior; he was a member of the Philippine Navy and was trained in a dangerous, mentally and physically strenuous underwater demolition activity; while in such training at the U.S. Navy base in Coronado, California, he suffered injuries and was hospitalized for a period of 28 days; while in the navy, he threatened to kill one of his cohorts; he underwent a summary court martial, and prior thereto was characterized as "depressed and has destructive tendencies"; he had been injured in the head on several occasions while engaged in karate and judo

psychiatric evaluation of the defendant. (Cf. *In re Ketchel* (1968) 68 Cal.2d 397, 401 [66 Cal.Rptr. 881, 438 P.2d 625].) On March 6, 1973, we appointed James R. Richmond, M.D., and Alvin Groupe, M.D., to conduct separate and independent psychiatric examinations of defendant and to report their findings to the court. In August of 1973, the two reports of the doctors were filed. In November 1973, supplemental briefs were filed by the parties.[3]

Before turning to the rather extraordinary facts of this case, we note that defendant raised numerous contentions on appeal. However, the main thrust was that he was denied the effective assistance of counsel. Other claimed errors should not arise on retrial; others have been rendered moot by the decision in *People* v. *Anderson, supra*. We have now limited the petition to the question of the constitutional adequacy of counsel under the circumstances of this case. (See *In re Hochberg* (1970) 2 Cal.3d 870, 875 [87 Cal.Rptr. 681, 471 P.2d 1].) Since this fundamental issue is also the main issue raised on appeal, we have chosen to consolidate the habeas corpus proceeding with the appeal. (*In re Miller* (1973) 33 Cal.App.3d 1005, 1009 [109 Cal.Rptr. 648].)

## FACTS

On May 29, 1968, defendant entered Mariani's Department Store in Stockton at approximately 4:30 p.m. During the next one-half hour, he selected various items of clothing with the aid of Mrs. Molina, a clerk in the store. After making his selections, defendant approached the check-out counter and without a word of warning pulled a gun from his pocket and shot and killed Mr. Chiari and then Mr. Mariani, who was counting cash at a nearby cash register. Defendant then proceeded to take the money from the register. Teresa Vizcarra, a clerk at the store, started to enter this area to see what was happening. Defendant shot her in the face and then fled from the store. Mrs. Molina made an in-court identification of defendant.

Fernando Moreno, a part owner of Mariano's liquor store, which is located immediately adjacent to the clothing store, heard explosions and ran over to the connecting store. There he met Frank Trucco, a partner in the

fights; there is a history of insanity in his mother, grandfather and cousins; and he had a history of violent and destructive, unprovoked incidents.

In the replication, defendant also includes a report by a psychiatrist who expresses the opinion that petitioner was legally insane on the day the crimes were committed.

[3]The Attorney General, in his supplemental brief, properly points out that defendant's counsel conveyed to Drs. Richmond and Groupe certain documents not provided to respondent. This unilateral action by counsel violates the spirit, if not the letter, of our order and is not to be condoned.

clothing store, who told Moreno that somebody had been shot. Moreno ran back to the liquor store, grabbed a gun, and told his wife to call the police. A gun battle then ensued between Moreno and the person he presumed to be the robber. Moreno observed money that "flew to the ground" when he shot at the robber.

Defendant attempted to enter and drive away in a 1964 Ford, but was unsuccessful. A Mrs. Ramirez, who did farm labor work with defendant from March through May of 1968, testified she last saw him on May 29 when she loaned him her automobile, a 1964 Ford. At trial, Mrs. Ramirez recognized the defendant; she knew him as Baltazar Garcia Estolas.

Sergeant Brazzel of the Stockton Police Department was called to the Mariani Department Store on May 29 and arrived there at approximately 5:08 p.m. A 1964 Ford, license number MFD 723, was parked on a street on the side of the store building where the gunfight had earlier taken place. Officer Brazzel removed from this vehicle $3,202.66 in cash, a large torn paper bag from Mariani's, various items bearing tags from the department store and certain other items. Most of these items had been removed from the gutter and placed in the car by two witnesses to the gunfight.

The following items were also recovered from the car: An automobile registration slip in the name of Mrs. Ramirez, a work order from a service station bearing the name Baltazar Garcia Estolas and a fingerprint subsequently identified as defendant's.

Two sisters, Ramona and Lydia Reynaga (ages 17 and 15), were at Mariani's Department Store between 5 and 5:30 p.m. on May 29, 1968. As they were leaving the parking lot, the defendant ran to their car (a 1966 aqua Comet 4-door sedan) and forced his way in at gunpoint. He ordered the girls to drive off, remarking that he had already killed two people and killing them wouldn't make any difference. He reloaded the gun and threatened to kill the girls unless they did as he told them. He also told them he wanted to go back and "shoot some more."

Defendant finally directed that he be driven to San Francisco and the girls did as he told them because he had a gun and a knife. At one point during the ride, he showed the girls a tattoo he had on his arm, a devil with a pitchfork, which was red in color. When they arrived in San Francisco, defendant let the girls out of the car after warning them not to go to the police. Both Ramona and Lydia made an in-court identification of defendant.

During the first part of June 1968, a Mr. Beech was hitchhiking from Idaho to his parents' home in Aurora, Illinois. Defendant, who was driving

a blue Comet, picked him up and drove him to Aurora. Beech knew defendant as Bob Garcia. Defendant lived with the Beech family for a while following their arrival in Aurora.

On June 15, 1968, in Aurora, Illinois, defendant sold a 1966 Comet for $150 to John Barber. The bill of sale, signed by defendant as Baltazar Garcia Estolas, stated that Estolas did, on June 15, 1968, convey to John Barber a 1966 Comet, aqua, 4-door sedan with a 6-cylinder engine, serial number 6J02T517466. Barber took the serial number from the car and wrote it on the bill of sale. Defendant gave Barber as security a California driver's license of Baltazar Garcia Estolas, the aforementioned bill of sale, a California fishing license in the name of Bal Estolas, and another California driver's license in the name of Patricia Garcia, claimed by defendant to belong to his sister. The driver's license belonged to a Miss Garcia, a friend of the Reynaga sisters, who had left the license in the Reynaga automobile. The automobile was the property of another member of the Reynaga family and was the car that Ramona Reynaga was driving on May 29, 1968, and which defendant forced them to drive to San Francisco and then stole from them.

In June of 1968, Clayborn Pearson, a resident of Aurora, Illinois, received a gun from defendant as payment for assisting in the sale of the automobile by defendant to Barber. Pearson was present when the sale was made, recalled the "devil" tattoo on defendant's arm and made an in-court identification of defendant. Pearson subsequently turned the gun over to the F.B.I. A slug which was removed by the autopsy surgeon from the skull of one of the victims was identified as having been fired from this gun.

Mary Bustamante knew the defendant in the New York City area in 1966 as Roberto Estolas. In July of 1968, she again saw the defendant in the area and he was then using the name Robert "Nevus or Neuves" or "something like that."

Defendant subsequently worked at the Goose Pond Inn in Monroe, New York, from July 20 to September 15, 1968, under the name of Roberto Neuves; he was also called Tomy. In September of 1968, defendant, under the name of Tomy Hwamei, was referred for employment to Glenmere Country Club, Chester, New York, by an employment agency in Montecillo, New York. He signed his application for employment as Tomy Isuki Hwamei.

Defendant was arrested at Langtry, Texas, on September 3, 1969, where he was advised of his rights and signed a waiver form. He was fingerprinted and the prints were sent to Washington, D.C. These matched the print

taken from the car at the scene of the crime and also fingerprints obtained by the F.B.I. from the Immigration Service.

Defendant's only defense was that of alibi, or more particularly a case of mistaken identification. He took the stand in his defense and testified that he was not Baltazar Garcia Estolas but that his name was Tomy Isuki Hwamei. He described himself as a cook and a drifter. He denied being in Stockton on May 29, 1968, and specifically denied being in Mariani's store and robbing or shooting anyone.

On cross-examination, defendant testified that he was born in Hawaii, left home at the age of four or five, and had not seen his family since that time. He entered the United States at Boston, Massachusetts, at the age of seven or eight, as far as he could recall, and had not returned to Hawaii since. Defendant's recollection of his past personal history was very vague.

We turn to the merits of defendant's main contention that he did not receive effective representation of counsel, based, primarily, upon court-appointed counsel's failure to undertake needed pretrial investigation which resulted in the forfeiture of any defense based on mental incapacity.

From the record (including the affidavit of trial counsel attached to the return), we can glean the following facts: Counsel, early in his investigation, became satisfied that Tomy Hwamei was, in fact, Baltazar Garcia Estolas. After arriving at this conclusion, counsel contacted the Philippine Consul in San Francisco, an uncle of Estolas in California, and wrote to the father of Estolas in the Philippines. He also contacted his congressman in order to try and get information from the Philippines through the State Department. None of these inquiries revealed any information that could have been used for a defense based on either insanity or diminished capacity.

Upon counsel's motion, the trial court appointed a psychiatrist to examine the defendant and file a written report with the court. Dr. Weiss, on the sketchy information available to him, concluded: "I find no evidence of mental illness at this time, nor can I elicit a history of it. The subject is able to understand the nature of the proceedings and is able to help his attorney rationally in his defense."[4]

---

[4]In all fairness to Dr. Weiss, it must be emphasized that he did not have the wealth of information (including a rather complete history of the subject Estolas) provided to Drs. Groupe and Richmond. In fact, after reviewing the reports of these two doctors, Dr. Weiss concludes that defendant must have been delusional when he interviewed him, since he insisted on calling himself Hwamei, whereas he was in truth Estolas. Dr. Weiss had apparently not been informed that there was *no doubt* as to defendant's true identity. Thus, the deficiencies in the trial are highlighted by defense counsel's acceptance of Dr. Weiss' psychiatric report although knowing the man was Estolas.

Defense counsel also made a request for funds to travel to the Philippines to seek information regarding defendant's personal background. In view of the defendant's assertions that he was not Estolas and had never been in the Philippines, the trial court denied the motion.

Throughout the proceedings below, defendant insisted he was Tomy Hwamei, a Hawaiian.[5] This presented trial counsel with a dilemma. However, since counsel was unable to uncover any evidence of insanity, he resolved the dilemma by presenting his client's defense in accordance with the latter's desire.[6]

Nevertheless, through his own efforts, appointed appellate counsel has developed much information tending to show that defendant was suffering from mental illness, and that a defense of insanity or diminished capacity was available had the proper investigation been undertaken. This documentary evidence was attached to the petition for habeas corpus. In the petition counsel declares that "[a]ll of the documents attached to this Petition were secured through the efforts of court-appointed appellate counsel through telephone conversations, written correspondence, and personal contact with persons having relevant knowledge about petitioner and his background."

Faced with the foregoing situation, we decided to appoint two psychiatrists to conduct independent examinations of the defendant.

The conclusions of Dr. Richmond can be summarized as follows: Defendant is presently overtly psychotic; there is a definite possibility, perhaps even a probability, that he was overtly psychotic at the time of the offense as well as at the time of his trial; defendant's contention that he was Hwamei and not Estolas certainly required some type of explanation at the time of trial and some investigation beyond what was accomplished; and the very bizarre nature of the crime required investigation of defendant's sanity at the time of the offense. It is Dr. Richmond's opinion that if he had had the information he has now (and confronted with the situation as Dr. Weiss was), he would have found the defendant to be psychotic and insane in accordance with the provisions of section 1368 of the Penal Code.

---

[5]Trial counsel took the legal officer from the Philippine Consulate to visit defendant in the San Joaquin County jail. Defendant maintained he could not converse with this officer since he did not understand the Philippine language. When defense counsel suggested to defendant that he bring his uncle to see him, defendant flatly refused.

[6]Since the prosecution effectively established Estolas as the killer and robber, the defense of mistaken identity was hardly a defense at all.

Dr. Groupe diagnosed defendant as suffering from schizophrenia, chronic paranoid type, with a fixed delusional system. He thinks that defendant has probably been schizophrenic since his adolescence. Dr. Groupe also believes the defendant could possibly have been actively psychotic at the time of the commission of the crime. He concludes that if this were the fact, it could explain the bizarre quality of the act itself.

Based upon these two reports and the entire record, we have concluded that defendant was deprived of a crucial defense which more careful inquiry would have divulged. (See *People* v. *Miller* (1972) 7 Cal.3d 562, 569 [102 Cal.Rptr. 841, 498 P.2d 1089]; *People* v. *Cortez* (1970) 13 Cal. App.3d 317, 328 [91 Cal.Rptr. 660]; *Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 39.) This lack of information further compounded the error since Dr. Weiss was not apprised of the true facts and this led to a meaningless and misleading evaluation. Furthermore, this was a bizarre, senseless crime that cried out for an explanation. The language in *In re Saunders* (1970) 2 Cal.3d 1033, 1048-1049 [88 Cal.Rptr. 633, 472 P.2d 921], is apropos: "We have concluded on the basis of this record and of the legal authorities already discussed that counsel's failure to undertake careful factual inquires and investigations concerning the matter of petitioner's diminished capacity to commit the crimes charged against him operated to deny petitioner the right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

". . . It must therefore be concluded on this record that the possible defense of diminished capacity 'was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all.' (*Brubaker* v. *Dickson, supra,* 310 F.2d 30, 39.)

"Moreover, the possible defense so withheld must be termed a 'crucial' one—especially in view of the insubstantiality of the defense actually offered. (See *People* v. *Ibarra, supra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *In re Williams, supra,* 1 Cal.3d 168, 175, 177 [81 Cal.Rptr. 784, 460 P.2d 984]; *Brubaker* v. *Dickson, supra,* 310 F.2d 30, 38-40.)"

It is clear on the record before us that petitioner did not receive the effective assistance of counsel to which he was entitled under the United States Constitution. (See *In re Miller, supra,* 33 Cal.App.3d at p. 1023.)

Having reached this conclusion, however, we would be remiss in not pointing out that appointed trial counsel was not totally at fault in this case. With the benefit of hindsight, we note that part of the error was im-

posed by the court when it denied counsel's motion for funds to investigate the defendant's background in the Philippines. Had defendant's family been one of means and retained private counsel, undoubtedly such a step would have been taken, among others, bearing in mind the prosecution was asking for the death penalty. It is, of course, well established that there can be no equal justice where the kind of trial defense a man enjoys depends on the amount of money he has. (See *Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 813-814, 83 S.Ct. 814].) In effect, this is one of those rare, extraordinary cases where our system of criminal jurisprudence for the indigent broke down, revealing the built-in limitations of that system. For this reason also, relief must be granted.

The judgment in 3 Criminal 6698 is reversed.

The writ in 3 Criminal 6754 is granted and defendant is remanded to the custody of the San Joaquin County Superior Court for further proceedings in accordance with the views expressed in this opinion.

Friedman, Acting P. J., and Janes, J., concurred.

A petition for a rehearing was denied March 18, 1974, and respondent's petition for a hearing by the Supreme Court was denied April 24, 1974.