Donald **WALLACE**, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Michael **KERN** et al., Defendants.

The **UNITED STATES** of America ex rel. Michael A. **McLAUGHLIN**, et al. Plaintiffs,

v.

The **PEOPLE OF** the **STATE OF NEW YORK** et al., Defendants.

Michael A. **McLAUGHLIN**, et al. Plaintiffs,

v.

The **PEOPLE OF** the **STATE OF NEW YORK** et al., Defendants.

Nos. 72–C–898, 73–C–55, 73–C–113.

United States District Court, E. D. New York.

May 10, 1973.

Stephen M. Latimer, Daniel L. Alterman, James Reif, Robert L. Boehm, Ann M. Garfinkle, New York City, for plaintiffs in 72–C–898.

Michael A. McLaughlin, pro se.

Louis J. Lefkowitz, Atty. Gen., State of New York, for defendants Supreme Court Justices, Administrative Judge, District Atty., Chief Clerk and State Administrator; Irving Galt, Joel Lewittes, Hillel Hoffman, Asst. Attys. Gen., of counsel.

Norman Redlich, Corp. Counsel, City of New York, New York City, for defendants City of New York and Commissioner of Corrections; Victor P. Muskin, John Nachazel, Asst. Corp. Counsels, New York City, of counsel.

Patrick M. Wall, New York City, for defendant The Legal Aid Society.

Lewis B. Oliver, Jr., New York City, Association of Legal Aid, City of New York, as amicus curiae.

## MEMORANDUM

### (On Motions for Preliminary Injunction)

JUDD, District Judge.

On motions for a preliminary injunction brought by the plaintiffs in the two above entitled actions, the court has conducted hearings on three aspects of requested relief, (1) with respect to the excessive caseload of the Legal Aid Society, (2) with respect to the refusal of the Chief Clerk of the Criminal Term of the Supreme Court to place *pro se* motions on the calendar, and (3) with respect to the District Attorney's control of the trial calendar.

### Facts

The Wallace case is a civil rights action which the court has determined may be maintained as a class action on behalf of all felony defendants who are or may be incarcerated in Brooklyn House of Detention for Men (BHD) pending indictment, trial or sentence. The McLaughlin actions are brought *pro se* by inmate plaintiffs, also detained at BHD, and complaining, among other things that the Legal Aid Society is too overburdened to provide adequate representation, and that *pro se* motions which must be submitted for lack of assistance of counsel are not accepted. The McLaughlin actions, brought after the Wallace action, have not been determined to be class actions, although they are brought as class actions. Plaintiffs in the Wallace action have moved to join the City and the Appellate Division as parties defendant, and to consolidate the Wallace action with the first cause of action in the McLaughlin actions, in which the City (sued as The People of the City of New York) and the Appellate Division are defendants.

The Criminal Parts of the Kings County Supreme Court are in a state of deep crisis. The Deputy Director of Operations of the Legal Aid Society testified that "The system isn't working." It has not been shown that any individual judge or any Legal Aid attorney or Assistant District Attorney is failing to do his best under existing circumstances, but it is small comfort to a defendant in jail to be told that the fault lies with "the system." The extent to which a federal court can and should protect defendants from the effects of the crisis must be considered in the light of the facts disclosed by the testimony and exhibits that were offered in court.

## Trial Delays

It is not unusual for defendants who cannot post bail to be held in custody for 12 to 15 months before their cases can be tried. There were 644 defendants who had been in the Brooklyn House of Detention for more than six months at December 31, 1972, and nearly half that number had been there over a year. A Legal Aid attorney testified that out of the last seven cases which he had tried in Kings County Supreme Court in early 1973, the defendants had been in jail for an average of 14 months, and two of them were acquitted. The Legal Aid Director of Court Operations testified on April 18, 1973 that the Society had recently obtained 12 acquittals of defendants who had been in jail from 12 to 14 months each.

When the court's Law Clerk assigned to this case visited the Supreme Court on March 26, 1973, he found that a typical calendar outside the Parts showed no trials scheduled which involved crimes committed later than 1971.

## The Burden on Legal Aid

The Legal Aid Society represents 75 percent of all defendants accused of felonies in Kings County and approximately 90 percent of all those who are held in custody on felony charges. During 1972, Legal Aid was appointed to represent 8,698 defendants in felony indictments in Kings County. Ultimately 90 percent of all indictments are disposed of by plea bargaining, but only 4,587 cases were terminated during 1972.

The average Legal Aid attorney is employed by the Society when he graduates from law school, attends a 21-day training course, serves an apprenticeship of a few months in the Criminal Court, then begins trying felony cases in the Supreme Court, and leaves after about two years for other employment. The newly hired attorneys practice in the Criminal Court while awaiting admission to the bar, under the supervision of an admitted lawyer, pursuant to a special court rule.

The active caseload of Legal Aid attorneys varies from 45 to over 90 felony indictments per Supreme Court lawyer, according to the oral testimony. The documentary exhibits show that on January 8, 1973 Legal Aid had 4,518 cases pending in Kings County Supreme Court, of which 557 were awaiting grand jury action, 2,677 were assigned to Parts, and 1,284 were awaiting sentence. In March 1973 Legal Aid had 48 attorneys assigned to Kings County Supreme Court. Their average caseload was therefore 94 total cases, or 56 cases if those awaiting grand jury action or sentence are excluded.

The Attorney-in-Charge of the Brooklyn office of The Legal Aid Society wrote to the City-wide Attorney-in-Charge in September 1971 that no trial attorney could handle more than 40 cases and cover arraignments and conferences. His assistant testified that 50 was the most one lawyer could handle, and that any increase in the caseload would erode the attorney's effectiveness on all his cases. One of the senior attorneys serving in the Supreme Court testified that he had a caseload of 91, and that he felt that 40 was near the limit of the number of files that he could handle adequately with proper attention to the defendant. Another attorney who had worked in the Legal Aid Society in the Supreme Court and then in the Community Defender Office and now in this court, stated that he estimated that a caseload of 30 to 35 was appropriate, in order to maintain a one-to-one relationship between attorney and client.

A private attorney said that he would not try to handle more than 25 to 35 active cases. The parties stipulated that three other members of the New York bar with from three to 17 years experience in criminal cases would give similar testimony.

Robert P. Patterson, Jr., former President of the Legal Aid Society, testified that he thought a fixed maximum was less important in criminal cases than in

civil, because of the limited number of criminal parts available, but he admitted that Legal Aid has insufficient staff to cope with the present circumstances. He described the two years of constant urging which had been necessary since the surge of indictments began in mid-1971, to obtain the extra help which has now been promised for mid-1973. In two successive years he threatened to cancel the City contract if more help was not forthcoming.

A defendant in the Kings County Supreme Court will be represented during his case by a series of Legal Aid attorneys.

An experienced and dedicated Legal Aid attorney with a caseload of 40 to 45 felony indictments described the proceedings under which defendants are asked to accept pleas which may involve sentences of five years or even more. She said the third floor pen where she would meet a defendant for the first time (four floors below the courtroom where the plea negotiations take place) is "a horrendous situation, physically" an "absolutely unbearable situation for Legal Aid" and "a humiliating experience for the defendant," with 40 people listening to the defendant's conversation with his counsel. She recognized that she could not adequately represent a defendant in such circumstances, and she would not have gone to trial under such circumstances, but said that it is a burden on Legal Aid to make trips to the jail. When a defendant whom she had met once and for whom she had negotiated a conditional 60-months sentence to the Narcotic Addiction Control Commission came up for sentence, she was busy on other matters in the courthouse and had to let another attorney appear for him, even though the Judge (as she had feared) refused to impose a NACC sentence and had the defendant reinstate his not guilty plea and go back to jail to await trial.

She testified that it is not unusual for a lawyer other than the one who appeared in the Conference Part to represent the defendant at the sentence. According to her, Legal Aid appears in Conference Part before it has prepared the case. The Conference Part, she stated, is for defendants who are guilty to plead at an early stage of the proceedings and there is no need to know about possible defenses. She did state, however, that the Legal Aid attorney in the Conference Part has a copy of the complaint, a criminal court report, a synopsis of any preliminary hearing, and write-ups by previous Legal Aid attorneys who have interviewed the defendant.

Plaintiff Wilson testified that he was assigned a Legal Aid attorney when he was arrested, was interviewed for from two to five minutes in the bullpen with six or seven other prisoners in the same enclosure, that he was represented by another Legal Aid attorney when he was brought to court a few days later and was interviewed for two minutes in the bullpen. He further testified that he was returned to jail and did not see a Legal Aid lawyer for the next 45 days, although a law student interviewed him in jail. He filed a *pro se* motion after he had been in jail for 45 days without being indicted and received a reply from the Chief Clerk stating that the motion had been filed and forwarded to the Legal Aid Society. The motion was granted on June 7 by Mr. Justice Rinaldi, but Wilson remained in jail until June 27, after he had been indicted and was brought up for arraignment, represented by a different Legal Aid Society attorney. When the attorney went out for coffee, Wilson examined his folder and found a copy of an order directing his release, but no one had informed him of the fact, and the court told him that his release had been nullified by the subsequent indictment. When he was in court for conference in Part 1–A, he was represented by a different Legal Aid Society attorney who talked with him in the bullpen twice about offers of a plea to a three-year sentence and later to a one-year sentence, which he refused.

He filed a *pro se* bail motion which was forwarded to the Legal Aid Society. He was in court around August 25th represented by a different Legal Aid Society lawyer, who offered him another plea without any interview. He submitted a letter to the court asking his release and received a form reply from the Clerk. In late September, he found out through the Law Journal that his bail had been reduced to $500 and on October 2nd, it was again reduced to $100 cash, which was posted, permitting his release. He was next in court on December 27 represented by another Legal Aid Society attorney who was not familiar with the facts and told him that the court was just getting people there to mark their cases ready and passed or to take pleas of guilty. There had been no communication to him from the Legal Aid Society between October 3 and December 27 and no further communication up to February 22, 1973, when he testified in this court.

Before Wilson filed his first *pro se* motion, he was told by a Legal Aid attorney that a motion for release because of delay in indictment would be futile in view of a hold from the Narcotic Addict Control Commission; however, this does not explain why the order directing his release was not brought to his attention, especially in light of the fact that he was released from all custody when his bail was reduced in October.

Randolph Jenkins, another of the inmate plaintiffs, testified that he was assigned a Legal Aid attorney when he was arrested, had a different Legal Aid attorney when he appeared in court a week later, asked the Legal Aid attorney to check records at the police precinct but was told that the attorney would be unable to get them. He asked the right to have a private attorney, but when he was unable to obtain one, the court appointed another Legal Aid attorney. He was released in May 1971, indicted in June 1971, assigned another Legal Aid attorney and brought to trial in April 1972 with still another Legal Aid attorney, the trial resulting in a disagreement on one count and a conviction on another.

When the Law Clerk assigned to this case went into one of the Supreme Court Criminal parts, selected at random, on March 26, 1973, after all the cases on the Ready Calendar had been marked "ready and passed," the Assistant District Attorney announced that he would proceed to trial on the Boone case. This was not on the calendar, but involved one of the defendants who had been granted the right to a speedy trial by the New York Court of Appeals in People ex rel. Franklin v. Warden, 31 N.Y. 2d 498, 341 N.Y.S.2d 604, 294 N.E.2d 199. Then the Legal Aid lawyer stated that he had just been informed of the trial date on the preceding Friday, and that he had not received a bill of particulars, explaining that he had just come into the case. When the Assistant District Attorney stated that his file contained no request for a bill of particulars, the Legal Aid attorney stated that the previous Legal Aid lawyer apparently had not served a demand. The fact that Legal Aid could not be prepared even on a test case which it had carried through the Court of Appeals tells volumes about the extent of its burden.

Citywide officials of Legal Aid oppose the setting of maximum caseloads because cases are not all alike and attorneys differ in ability, and the City might force the Society to treat any maximum as a minimum in fixing appropriations. One Legal Aid attorney in an executive position testified for the defendants that he could prepare ten felony cases in a week. The statement, if true, would be an extreme example of accommodation to an unsatisfactory system. The court gives it no credence.

Even if a Legal Aid attorney has been assigned for a defendant in the Criminal Court, a new appointment is necessary in the Supreme Court after a defendant is indicted.

Frederick Cohen, a private attorney with six years experience, testified that

when he represents a client he always goes to the scene of the crime, attempts to use the client as an investigator if he is not in jail, in order to locate witnesses, that he files motions for bills of particulars, for discovery of exculpatory material, and for identification hearings if there has been a line-up, and that such motions not only help him obtain information but force the Assistant District Attorney to look at the case and perhaps consider a favorable negotiated plea. If there is a long delay in jail, the attorney brings a habeas corpus application. In connection with habeas corpus and bail applications, he interviews as many people as he can, not only to find the defendant's roots in the community but to identify possible character witnesses.

On the other hand, the head of the Brooklyn Legal Aid office testified that it is not a frequent occurrence for a Legal Aid attorney to see his client in jail while the case is pending, although paraprofessionals go to the jail every day to see if any inmate has any problem or to bring the Society's attention to anyone "who has been lost in the system." One of the senior attorneys stated that he goes to the jail twice a month, but has to wait at least an hour to have his client brought down and cannot talk to more than two clients in a session. He would like to go out on his own investigations, but has no time because he could take all day on one case. He would like to look up cases and prepare affidavits in support of motions, but for lack of time submits mainly form motions. Questionnaires circulated on the seventh floor of the Brooklyn House of Detention showed that only one of 30 defendants represented by Legal Aid had received a visit from counsel, whereas five out of 15 with private attorneys had been visited.

The budget requests submitted to the City by the Legal Aid point out that lack of supporting personnel means that attorneys earning higher salaries than aides must put in more of their time preparing a case, and that delays in reaching a case mean that more time must be spent than would otherwise be necessary, because the attorney and the client have to refresh their recollections and go over the same matter several times.

The seriousness of the problems of delay, and its long continuance, are shown by figures on the Kings County Supreme Court in Legal Aid's budget requests to the City for the fiscal year 1974. A comparison of intake of new cases with dispositions or output of old cases, gives the following figures:

|  | Intake | Output |
|---|---|---|
| Fiscal 1971 | 4,372 | 2,224 |
| Fiscal 1972 | 7,259 | 4,657 |
| Fiscal 1973 (projected) | 8,480 | 3,896 |

The budget report states:

The output-input relationship, which has increased from fiscal year 1971's level of 51% to fiscal year 1972's level of 64% has substantially dropped to 47.6% projected for fiscal year 1973. This is further evidence of the total breakdown of Supreme Court operations in Kings County.

The declining intake-output ratio reflects in part the dramatic increase in indictments in Kings County as reflected in the reports of the Judicial Conference of the State of New York:

| July 1, 1969 to June 30, 1970 | 5,027 |
|---|---|
| July 1, 1970 to June 30, 1971 | 7,291 |
| July 1, 1971 to June 30, 1972 | 11,064 |

The evidence indicates a sharp decline (25% to 40%) in the rate of new indictments since January 1, 1973.

The Attorney-in-Charge of the Brooklyn office of Legal Aid wrote to the City-wide Attorney-in-Charge on October 31, 1972 that,

I have found the majority of the staff here to be hardworking and conscientious. However, the backlog of cases and the consequent delay have completely undermined staff morale.

Legal Aid attorneys compare favorably with private attorneys both in quality of their work and in their results. Their acquittal rate is approximately the same as that of private attorneys. In the calendar year 1972, Legal Aid obtained acquittals in 39.1 percent of the cases that were decided by jury verdict, but there were only 140 trials out of 4,587 cases that were closed. The evidence at the hearings did not analyze the extent to which pleas of guilty may have been influenced by the improbability of a prompt trial.

In computing caseload, Legal Aid omits defendants who had a preliminary hearing and are awaiting grand jury action and also defendants who have been found guilty or pleaded guilty and are awaiting sentence. One witness stated that there is minimal work after the guilty plea if there has been a conditional agreement on sentence, although there is more if there has been a trial and a guilty verdict or a plea of guilty and no commitment concerning the sentence.

## Pro Se Motions

The Court Clerk in charge of criminal motions testified that he receives from 25 to 50 *pro se* motions in an average day, requesting such things as a bill of particulars, dismissal of indictment, suppression of evidence, and almost any other motion that an attorney might make. They are clocked in, checked against the docket, and if the movant is represented by counsel, the papers are sent to counsel and the movant is sent a form letter stating that *pro se* motions are not entertained and that the papers have been sent to his counsel.

The Clerk testified that there are from 25 to 70 motions on the motion calendar each court day and that calendaring *pro se* motions would mean a substantial increase in the number to be considered.

Although the instructions to Legal Aid Society personnel are to put a back on *pro se* motions and file them with the court, one of the Legal Aid Society attorneys testified that if they are busy, they just place the motions in their file. One attorney had "a stack" of unfiled motions when he left Legal Aid, according to the Assistant Attorney-in-Charge. It appears to the court that the vast majority of such motions are not placed on the calendar by the Legal Aid Society, regardless whether they are meritorious or frivolous.

It often takes more than a month to process a motion and get it to the Legal Aid office on the next floor of the courthouse because of unfilled vacancies in the Clerk's office. Legal Aid has not been able to establish any procedure for prompt pick-up of *pro se* motions.

Legal Aid witnesses testified that many *pro se* motions are frivolous, and some may contain information damaging to the defendant, but no instances of damaging information were proffered.

The policy with respect to *pro se* motions is based on a directive from Mr. Justice Miles McDonald on October 1, 1969 when he was the Administrative Judge, and when the burden on the Legal Aid Society was probably substantially less than it is today.

There are two exceptions to the policy of not entertaining *pro se* motions. Motions to relieve counsel will be placed on the calendar. Motions submitted to the Appellate Division and forwarded by that court will also be placed on the calendar, pursuant to the directions in a letter from the Clerk of the Appellate Division dated January 15, 1973, after the commencement of this law suit.

## Calendar Control

The District Attorney's control of the calendar creates additional problems for Legal Aid because it is difficult to try a case properly on 24-hours notice.

A memorandum from the Associate Attorney-in-Charge of the Brooklyn office of Legal Aid to the City-wide Attorney-in-Charge pointed out that the practice of skipping down to Number 50 or 60 on the calendar for immediate trial of a case

will play havoc with our staffing requirements above and beyond the problems of having to participate in a trial on such notice.

Legal Aid asserts that the Assistant District Attorney would often like to try his "best case", and consequently Legal Aid cannot be sure in what order cases will be reached. Where a case is triable, it is clear that forcing Legal Aid to crowd its final preparations into the weekend before the trial is prejudicial to the defendant. There are circumstances, such as unavailability of witnesses for either side, which make it difficult to follow an exact chronological order in the trial of cases even in Legal Aid parts.

Shifting control of the calendar to the courts might create practical problems unless additional clerical staff were provided, in addition to filling vacancies. The Administrative Judge for the Criminal Parts of the Supreme Court was quoted as estimating that supporting personnel have accumulated $1,000,000 worth of compensatory overtime or postponed vacation time, in their efforts to cope with the problem. Lack of clerical staff was given as a reason why several trial parts must be closed during the summer, although Legal Aid asserts that it has attorneys ready to try jail cases.

Of the last six cases tried by Legal Aid in its Criminal Parts, one was the oldest jail case on the calendar, one was skipped over 13 older jail cases, one had never appeared on the ready calendar before it was moved for trial, another was jumped over 40 older cases, another was tried ahead of nine older jail cases, and the final one was Number 125 on the calendar.

The only Supreme Court Justice who testified, as a witness for plaintiffs, stated that although the Judges have legal control of the calendar, their power is not generally exercised in practice. The District Attorney chooses from the top 10 or 20 cases. Cases are marked ready and passed which are not really ready for trial. Recently the District Attorney has not departed as frequently from chronological order.

### 18–B Attorneys

The panel of attorneys under Article 18–B of the County Law includes a broad spectrum of the bar, but numbers of good attorneys have withdrawn from the panel because of the inadequacy of compensation. The maximum permitted by the legislature is still $15.00 per hour for work in court and $10.00 per hour for work outside court. Even these figures are unrealistic, because the courts feel an obligation to the City to reduce the fees below the maximum.

One 18–B attorney who spent 302 hours on a seven-weeks trial was awarded only $3,000 by the trial judge, and this was cut to $1,500 by the Appellate Division, a rate of $5.00 an hour, or substantially less than a plumber or a TV repairman would receive.

According to one witness, 18–B attorneys almost never receive even the full hourly rate for their services. Fees of 18–B attorneys are a county charge, and are not limited by any budget figure.

The plan of the county bar associations requires seven years experience before an attorney can be put on the 18–B panel, unless he has had "exceptional experience." The testimony indicates that the attorneys on the 18–B panel are of about equal quality with Legal Aid attorneys. Their overall acquittal rate, according to the Administrator of the Indigent Defendants Panel, is 38.8 percent. They have tried about seven percent of their cases, a higher proportion than Legal Aid.

No funds are provided for recruitment, training or supervision of 18–B attorneys. The present panel could carry more cases than are now assigned, but not as many as would result if all Legal Aid assignments in the Criminal Court were temporarily interrupted. Unlike Legal Aid attorneys, 18–B attorneys and other private attorneys are hampered by the fact that they are prevented from interviewing their clients

before they are arraigned in Criminal Court.

## Studies of the Problem

There have been three recent inquiries into the legal representation of indigents in New York City. The first was dated June 17, 1971 and was made by a "Subcommittee on Legal Representation of the Indigent" appointed by the Appellate Divisions of the First and Second Departments and including Hon. Robert L. Carter, then a member of the Mayor's Committee on the Judiciary and now a United States District Judge for the Southern District of New York, as Chairman; Hon. Alfred M. Ascione, Justice of the Supreme Court, New York County; Hon. Vincent A. Massi, former Assistant Administrative Judge of the New York City Criminal Court; Hon. Florence M. Kelley, Administrative Judge of the Family Court and former Attorney-in-Charge of the Criminal Branch of the Legal Aid Society; Hon. John C. Leonforte, Judge of the Civil Court; Hyman W. Gamso, Administrator of the Indigent Defendants' Legal Panel, First Department; Hon. Harold J. Rothwax, Judge of the Criminal Court and former Director of Legal Services for Mobilization for Youth, Inc.; Oscar Gonzalez-Suarez, member of the Mayor's Committee on the Judiciary; Prof. Harry Subin of New York University School of Law, former Associate Director of the Vera Institute of Justice; Arthur C. Muhlstock, former Assistant District Attorney, New York County, and member of the Committee on Criminal Courts, Law and Procedure of the Association of the Bar of the City of New York; Orison S. Marden, Esq., Chairman of the Board of Directors of the Legal Aid Society; Hon. David L. Malbin, Administrator of the Indigent Defendants Legal Panel for the Second and Eleventh Judicial District; and Joseph P. Hoey, former United States Attorney for the Eastern District of New York.

Among the primary recommendations of the Committee were continuity in representation of defendants and a de-termination of maximum caseloads for Legal Aid attorneys. The Committee recommended the use of paraprofessionals in order to provide improved legal services, a step which is being taken.

With respect to the question of individualized responsibility, the Carter Commission stated (p. 10):

> The Society's practice of fragmenting its representation so that one defendant may have as many as 5 or 6 different attorneys during the course of his case is most undesirable and should be stopped. . . .

> Insofar as the Society is not meeting that standard, its performance is, we believe, inevitably deficient.

On the question of caseload, the Commission stated (p. 12):

> It would then, in our view, be appropriate for Legal Aid to decline to accept assignments over the number which it could treat in the comprehensive way here proposed. This may tend to cause some disruption in present procedures. We feel, however, that the alternative is a continuation of a type of representation grossly overburdening to the Society, and which all, including the Society's attorneys, recognize as inadequate.

The Commission specifically recommended that the Appellate Divisions require the Legal Aid Society to determine a maximum lawyer-client ratio "beyond which it cannot provide effective representation," and that this determination "can be made without undue delay."

Nine months later, on April 17, 1972, there ensued a meeting of the Legal Aid Society with the Administrative Assistant to the Presiding Justice of the First Department, at which the Society stated that:

> All of the substantial recommendations of the report relating to the Society have either been fully implemented or are in process of implementation.

With respect to maximum caseload, it stated only that "the question of the

caseload is complex" and that "the area should be intensively studied."

There followed in August 1972 a press release from the Appellate Divisions which described the Carter Commission Report as "a milestone in the progress of the administration of criminal justice" and said that "many of these recommendations have already been independently implemented by the Legal Aid Society as part of its current reorganization effort." The press release made no mention of the determination of maximum caseloads.

The second report was by Commissioner William J. vanden Heuvel, then Chairman of the Board of Corrections of the City of New York, dated March 25, 1973, and following two days of public hearings.

The report called attention to the difficulties encountered by defense attorneys visiting their clients at the jails, because of the delays which were involved, and referred to the hectic atmosphere and the lack of private interview facilities that resulted from the more convenient practice of interviewing clients at the courthouse. The report stated:

This practice of courthouse interviews contributed to the alienation and anxiety felt by many incarcerated defendants who complained that they rarely have the opportunity to consult with their attorneys.

The report commented on the continuing necessity of fixing a maximum caseload for Legal Aid attorneys, stating (p. 26):

As long as their caseloads remain at the present staggering levels, it is impossible for Legal Aid attorneys to form productive relationships with their clients, thoroughly investigate and prepare their cases, counsel their clients, and take an active role in the sentencing process. In short, an attorney with an active caseload of 100 felony cases cannot provide effective representation to his clients. Therefore, we recommend that maximum active caseloads be established by Le-

gal Aid, beyond which it will refuse to accept cases. This proposal is not new.

The most recent report was issued in early April 1973 by the City's Executive Committee Criminal Justice Coordinating Council. The report, entitled 1973 Criminal Justice Plan, gave the Legal Aid Society high marks for reforms which had been instituted during 1972 and noted that the Society

has removed itself as a potential bottleneck to speedy justice and efficiency in the criminal justice system, thus increasing its credibility among its clients and the public.

However, the report went on to note that significant problems remained, chiefly fragmented representation.

An acceptable one-to-one relationship between client and attorney has yet to be developed. At present attorneys are assigned to court parts rather than to individual cases. Although this is a necessary budget-saving device, it hampers the intimate attorney-client relationship available to those who can retain private counsel. Moreover attorneys are unfamiliar with a case until it is assigned to them in court. There is no time to order investigations or to fully prepare case arguments. Valuable court time is lost in this manner for all parties—judges, prosecution, attorney and client. Clients are reinterviewed as they pass from court part to part, from one attorney to another. The rapport between attorney and client suffers in this process, impinging adversely on plea-bargaining, trial strategy and sentencing decisions.

*Steps Already Taken*

Legal Aid had endeavored to obtain funding for increased staff from sources other than the City of New York. An Emergency Felony Case Processing Program is being funded by the State Division of Criminal Justice Services and the City of New York. A grant award was made by the New York State Division of Criminal Justice Services to as-

sist in the creation of a prison parapro-fessional unit within the Legal Aid Society of the City of New York. A grant award was made by the Division of Criminal Justice in the State Office of Planning Services for Legal Aid specialized units. Six new Criminal Parts will be opened in the Kings County Supreme Court, two in May and four in September.

A digital system has been instituted in Kings County Supreme Court so that a case will be assigned an indictment number even before the grand jury has acted and the final digit in the indictment number will determine which part the case will be assigned to and will permit the prompt assignment of a Supreme Court Legal Aid lawyer.

The Legal Aid staff in Kings County is expected to increase from 48 attorneys to 57 attorneys by the end of May 1973 and to 66 attorneys by September 1973.

Some jail cases have now been transferred to the Bail Parts, so that there is less risk of defendants on bail being tried ahead of older jail cases.

The District Attorney as well as Legal Aid would like to have more staff. With only two Assistants per part, it is difficult to have back-up cases if unexpected guilty pleas are received in those he has prepared for trial.

The testimony of a Supreme Court Justice was that the available facilities are not being used effectively. Although the District Attorneys are now moving cases more nearly in chronological order, he finds that almost a third of his time is wasted on logistics or waiting for a case that is ready for trial.

### Discussion

Most of the issues of law presented in the case have been resolved in the earlier Memorandum and Order of Judge Weinstein dated July 11, 1972 and those of this judge dated February 15, 1973 and February 27, 1973 in the Wallace case and April 6, 1973 in the McLaughlin case. The major legal issues

remaining for consideration are the requirements for a preliminary injunction, the standards of effectiveness of counsel, and the question of abstention.

### Preliminary Injunction

The basic rule for the issuance of a preliminary injunction calls for a weighing of the probability of ultimate success against the relative hardships to the parties. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

On the facts as developed at the hearings, the plaintiffs have a reasonable probability of success on all three issues. There is obvious and irreparable hardship to criminal defendants in jail whose relief against impairment of constitutional rights is delayed. There will be no appreciable hardship to The Legal Aid Society in being prevented from accepting additional assignments for a period of time, and relatively minor hardship on the Court Clerks and the Judges in being required to consider *pro se* motions. Appointment of more 18–B counsel will cause some inconvenience to the Judges and Court Clerks, because such counsel will not be permanently assigned to a Part, like a Legal Aid attorney, and some calendar delays may result, but this factor is not sufficient to overcome the need for immediate relief.

### Effectiveness of Counsel

The facts show that Legal Aid attorneys have excessive caseloads and that the conditions under which they must work are shocking. There is no proof, however, that their representation of any defendant on an actual trial or plea has been "farcical," one of the tests used to upset a conviction. The question at this time is not whether any verdict or plea may be upset because of ineffectiveness of counsel, but whether the practice of the state (and city) agencies charged with furnishing counsel meets the standards of the Sixth Amendment of the United States Constitution, and whether it would be fair or realistic to

leave consideration of these claims for post-conviction adjudication in individual cases.

■ The right to be represented by counsel at all critical stages of a criminal prosecution is one of substance, not form. Long before the right to appointed counsel was extended by the decision in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Supreme Court recognized that the right to counsel would be meaningless if it did not require effective assistance and substantial aid. Powell v. Alabama, 287 U. S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In a case later than *Powell,* Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940), the Supreme Court said,

> [T]he denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given assistance of counsel.

The right to the effective assistance of appointed counsel is not a welfare gratuity benevolently bestowed by an indulgent sovereign. The deliberate choice of an adversary system requires that both sides have professional and adequate representation. *See* American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services, pp. 2–6 (approved draft, 1971) (Providing Defense Services). Last term, the Supreme Court again recognized the importance of counsel in criminal prosecutions and extended the right to appointed counsel to all cases involving the possibility of a jail sentence. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). Both Chief Justice Burger (concurring) and Justice Powell (concurring in the result) reiterated that the adversary system functions best and most fairly only when all parties are represented by competent counsel. 92 S.Ct. at 2014–15, 2026.

Defendants have cited a long string of cases supporting their position that representation is constitutionally adequate unless it is so woefully deficient as to shock the conscience of the court and make the proceedings a farce and a mockery of justice. *E. g.,* United States ex rel. Marcelin v. Mancusi, 462 F.2d 36 (2d Cir. 1972). All of the cases cited, however, involve post-conviction challenges either direct or collateral, to the quality of representation. There are many good reasons for imposing such a stringent standard in individual cases after conviction. *See* Brubaker v. Dickson, 310 F.2d 30, 39 (9th Cir. 1962), cert. denied, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963). It is easy for a convicted defendant to make unfounded allegations of incompetence and there is a natural temptation for a defendant to place the blame for conviction on his lawyer. A criminal trial or a guilty plea involves a great number of interrelated decisions and value judgments which may appear simple from hindsight but are difficult when made. This difference in prospect makes reviewing judges wary of substituting their view of the correct decision for the one made during pretrial preparation or in the heat of trial. There is also a strong interest in terminating litigation. This is especially so where there has been a guilty verdict after trial or where admissions of guilt have been made in response to the inquiry required when a guilty plea is entered. In the latter, the defendant in a federal court will most likely have answered "yes" to the question whether he was satisfied with the representation given him by his attorney.

None of the reasons which support the imposition of strict standards in post-conviction cases is applicable in the posture in which the question of adequate representation is presented here. The hesitancy to indulge in second-guessing previously made decisions is not an ob-

stacle. What is in issue is not how to investigate, what plea to accept, which witnesses to call, what defenses to put forward, how to examine and cross-examine, but whether the Legal Aid attorneys are so overburdened that they cannot even make the necessary decisions.

Although the court has determined that the adequacy of representation by The Legal Aid Society may be measured by a different standard, the post-conviction cases are instructive on the components of constitutionally sufficient representation. Lack of preparation, investigation, and consultation are ubiquitous complaints in the adequate representation cases. In Braxton v. Peyton, 365 F.2d 563, 564 (4th Cir.), cert. denied, 385 U.S. 939, 87 S.Ct. 306, 17 L.Ed.2d 218 (1966), for instance, the court stated that

> [T]he assigned lawyer should confer with the client without undue delay and as often as necessary, advise him of his rights, ascertain what defenses he may have, make appropriate investigations, and allow himself enough time for reflection and preparation for trial.

■ Preparation and investigation must be more than perfunctory. Counsel has an affirmative duty to conduct appropriate investigations, both factual and legal. Coles v. Peyton, 389 F.2d 224, 226 (4th Cir.), cert. denied, 393 U. S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). A lawyer may not fabricate defenses, but must determine whether valid defenses exist. Jones v. Cunningham, 313 F.2d 347, 353 (4th Cir.), cert. denied, 375 U.S. 832, 84 S.Ct. 42, 11 L.Ed. 2d 63 (1963). Failure to ascertain and investigate possible defenses has often resulted in a finding that the defendant was denied adequate representation. *See* Goodwin v. Swenson, 287 F.Supp. 166, 176–86 (W.D.Mo.1968).

■■ Consultation with the defendant to elicit information and to inform him of his rights is imperative. Braxton v. Peyton, *supra,* 365 F.2d at 564. This is especially true where the defendant pleads guilty. Windom v. Cook, 423 F.2d 721 (5th Cir. 1970). Short and harried interviews in the courtroom have been discouraged. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L. Ed. 309 (1948). The failure to investigate, research, and prepare is equivalent to no representation at all. Brubaker v. Dickson, *supra,* 310 F.2d 30; Williams v. Beto, 354 F.2d 698 (5th Cir. 1965); Brooks v. Texas, 381 F.2d 619 (5th Cir. 1967).

The Supreme Court in Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), emphasized a number of factors relevant to adequate representation. The failure to appoint a single attorney with an individualized sense of duty to his client was highlighted. The Court also mentioned the need for step-by-step consultation with the client and thorough-going investigation and preparation.

A number of the standards endorsed by the American Bar Association Project on Standards for Criminal Justice are relevant in measuring the adequacy of representation provided by the Legal Aid Society. Chief among these is the rule that a lawyer must not accept more employment than he can discharge within the limits of his capacity to give each client effective representation. [The Defense Function, § 1.2(d)]. A lawyer must establish a relationship of trust with his client [Section 3.1(a)]. The commentary to this section notes that building a relationship of confidence and trust is normally more difficult for the assigned attorney and requires repeated interviews to develop a working rapport. The interviews should be carried on in private and the lawyer must protest against barriers to the development of a reasonable lawyer-client relationship. [Section 3.1(c)]. The lawyer has a duty to keep his client informed of the developments in the case and the progress of preparing the defense. [Section 3.8]. Section 4.1 outlines the duty to investigate, which exists regardless of the defendant's admissions or his desire to

plead guilty. The commentary notes that the lawyer must employ ingenuity to locate witnesses and that the lawyer's duty is to determine from knowledge of all the facts whether the client is guilty in law, not in some moral sense. Investigation, moreover, is necessary, not only for trial preparation, but for intelligent plea-bargaining. In fact, plea-bargaining should not begin until after full investigation. [Section 6.1(b)]. Termination of the trial does not terminate a lawyer's duty, for the attorney has an important function in the sentencing process. [Section 8.1]. The importance of preparation to represent the defendant at sentencing, even after a guilty plea, is underlined by the showing in the record that sentences do not always conform to what was contemplated during the plea-bargaining process.

■ Comparing the level of representation now provided by The Legal Aid Society with the American Bar Association Standards, it becomes evident that the overburdened, fragmented system used by Legal Aid does not measure up to the constitutionally required level.

The overburdening of its attorneys is not the fault of The Legal Aid Society, and it may not prevent adequate representation being given in cases that are actually tried. It is important, however, that criminal defendants have the appearance of justice as well as having a coincidental right result in the end. As is stated in the Kerner Report, Report of the Advisory Commission on Civil Disorders, Bantam Ed. 1968, p. 337:

> The belief is pervasive among ghetto residents that lower courts in our urban communities dispense "assembly-line" justice; that from arrest to sentencing, the poor and uneducated are denied equal justice with the affluent.
>
> · · ·
>
> The quality of justice which the courts dispense in time of civil crisis is one of the indices of the capacity of a democratic society to survive. To see that this quality does not become

strained is therefore a task of critical importance.

*Abstention and Comity*

■ This court dealt with the doctrine of abstention recently in the Willowbrook case, where the state had failed to give adequate protection to persons in custody but was in the process of delayed correction of deficiencies. New York State Association for Retarded Children, Inc., et al. v. Rockefeller, et al., 72–C–356, 72–C–357, Memorandum and Order dated April 10, 1973. The court there held that it would not abstain but would restrict relief to the most urgent items. This case is similar. It does not involve the constitutionality of state statutes, but practices by state and municipal officers that are violative of civil rights.

■ Where there is a present violation of constitutional rights, the hope of delayed correction by the state (or the city) should not stay the hand of a federal court. Watson v. City of Memphis, 373 U.S. 526, 532–33, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963); Rozecki v. Gaughan, 459 F.2d 6 (1st Cir. 1972). The state defendants, in a post-hearing brief which describes only the recent improvements in procedure and none of the facts concerning Legal Aid's overburden, request that the court abstain. The situation here is not comparable to Kirstein v. Rector of University of Virginia, 309 F.Supp. 184 (E.D.Va.1970), which the Attorney General cites. In that case, relating to the admission of women to the University, the court approved a plan which had been proposed by the Board of Visitors of the University, and dismissed the case as moot. Prolonged stays in jail and inadequacies of legal representation are in a different category, and are only in the first stages of correction.

The Legal Aid Society urges that the court convene a meeting of all major participants in the Kings County Criminal Justice System, and call for the submission of a plan with objective criteria

and goals, rather than issuing any order at this stage.

In the light of Mr. Patterson's testimony concerning the time which was necessary to accomplish his objectives as President of Legal Aid, the experience shown by the record concerning the delay between the increase in Kings County indictments and the increase in Legal Aid staff, and the importance of determining whether Legal Aid can be prevented by contract from exercising the independent judgment of an attorney concerning the capacity of its staff to handle additional cases, the court considers that this is not a proper case to abstain, except in respect of the issue of calendar control. Other issues remain in both cases, which the court would willingly discuss at a conference with state and city officials, if that appears to be a useful course at the time.

This court's Memorandum and Order dated February 27, 1973 found that the comity doctrine as defined in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971), and subsequent cases would not bar injunctive relief. That discussion need not be repeated. However, while the court remains mindful of the limitations on federal court intrusion in a state's criminal justice system, it bears reiteration that the crisis situation in Supreme Court, Kings County, its long existence, and the failure of the state and city thus far to provide effective remedies justifies federal court action. Cf. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

*Maximum Caseload*

The fact that the present caseload of Legal Aid attorneys is too high, appears clear from the testimony of witnesses for the defendants as well as for the plaintiffs and from all of the independent studies which have been made. City-wide officials of the Criminal Defense Division have insisted here, however, that a caseload limitation would be meaningless if additional court Parts are not added and calendar control reforms instituted at the same time. Other changes beside a caseload limitation are indeed necessary. Nevertheless, the first place to start is with the quality of representation under existing conditions, and this can be done only by applying the Standard that a lawyer should not accept employment beyond his capacity to handle effectively. The opposition to a maximum caseload may relate to the relations between The Legal Aid Society and its staff bargaining agent as well as to the rights of defendants.

There are difficulties in fixing a maximum caseload, and what is too high in one county may be manageable in another county. Some cases will require much more time than others and some attorneys will have a different mix of cases than others. Fixing an *average* caseload for Kings County and permitting Legal Aid to make adjustments within that average is an appropriate way to deal with the problem.

The maximum set now may be different from what could be managed if defendants did not stay in jail as long, if there were better facilities for interviews, if there were more adequate supporting services, and if problems of calendar control are resolved. The limit which the court fixes now may be changed in the future if experience or changed circumstances justify.

Determination of the maximum caseload is complicated by the fact that computations have been directed only to cases assigned to Parts, excluding the critical period between preliminary hearing and indictment and the period between guilty plea or verdict and sentence. Effective investigation need not wait for the return of an indictment, and on occasion may even prevent the client from being indicted. With the digital system which has been adopted, it should be possible for Legal Aid to assign a case to an attorney before indictment, so that investigation can proceed while trails and memories are fresh. Excluding cases awaiting sentence from the caseload is inconsistent with the constitutional requirement for advice of counsel at the

time of sentence. Carter v. Illinois, 329 U.S. 173, 178, 67 S.Ct. 216, 220, 91 L.Ed. 172 (1946); Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); United States ex rel. Diblin v. Follette, 418 F.2d 408 (2d Cir. 1969). New York law permits defense counsel to file a presentence memorandum in all cases. C.P.L. §§ 390.40, 400.10.

As Dean Van Hoomissen of the National College of District Attorneys said at the National Judicial Conference on Standards for the Administration of Criminal Justice, with respect to the Standards Relating to Providing Defense Services (57 F.R.D. 229, 302):

> At sentencing, the ability of counsel to present to the court a plan or program will in many instances result in a deferred or a suspended sentence or probation, while the absence of such a program will often result in incarceration.

Since the testimony related the caseload only to the cases in the trial Parts, the court will use that category for its finding, but will require an overall evaluation by the local Attorney-in-Charge before Legal Aid may accept any additional cases.

The court is convinced, and finds, that an average caseload of 40 felony indictments pending in a trial Part strains the utmost capacity of a Legal Aid attorney under existing conditions, that the present average caseload is substantially in excess of that number, and that acceptances of any additional felony indictments by Legal Aid would prevent it from affording its existing clients their constitutional right to counsel.

Legal Aid should not be permitted to accept assignments in any additional cases (except new charges against defendants already represented) until the average caseload of its attorneys assigned to trial Parts is below 40 *and* until the Attorney-in-Charge of the Brooklyn office certifies on his own professional judgment (after consultation with his Brooklyn supervisory staff) that the attorneys on his staff are able to give effective representation to the defendants they represent and to any net additions that may be anticipated within the next month.

It would not be proper to increase the Kings County staff by depleting other counties.

Relief of Legal Aid should become effective within about a week, since the parties and the Brooklyn Bar Association have already been notified of the likelihood of such action. The need for relief will not be obviated by the anticipated addition of new attorneys later this spring.

*18–B Attorneys*

Interruption of Supreme Court assignments to Legal Aid will mean that new cases must be assigned to 18–B attorneys. The evidence indicates that they are approximately equal in ability to the Legal Aid staff. The Administrator testified that they can handle some additional cases. It should be possible to recruit enough additional members to the Panel at least to handle cases coming up before September, when it may be that additional staff will permit Legal Aid to resume accepting assignments.

There are means at hand of making service under Section 18–B more attractive to attorneys. It is no longer true as was stated in 1967, People v. Perry, 27 A.D.2d 154, 278 N.Y.S.2d 323 (Sup.Ct.N. Y.Co. and Kings Co. 1967), that $10.00 to $15.00 an hour is the same as the Criminal Justice Act rates, which were doubled in 1970. 18 U.S.C. § 3006A(d). The continuing validity of the *Perry* guidelines even outside New York City was questioned as long ago as 1969. People v. Wilson, 60 Misc.2d 144, 302 N.Y.S.2d 647 (Co.Ct.Monroe 1969). The state courts may recognize the economic facts of law practice today by granting allowances for the full time necessarily expended on cases by 18–B attorneys. It is by no means certain that the Legislature will leave the compensation rate indefinitely at the present figure. An increase was recommended in 1971 and 1972 by a committee of the Association

of the Bar of the City of New York. 28 The Record 68, 69 (1972).

In any event, difficulties in recruiting 18–B attorneys do not justify forcing Legal Aid to accept more clients than it can effectively represent.

### Pro Se Motions

The Appellate Division, at least through a letter from its Clerk, has recognized that *pro se* motions should be placed on the calendar. Since *pro se* motions have been filed to some extent because of frustration at lack of communication with their attorneys it is a denial of access to the courts to send motions to attorneys who do not pursue them. Federal courts have forbidden state officials to screen applications made to the courts by persons in custody. Johnson v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969); Beard v. Alabama Board of Corrections, 413 F.2d 455 (5th Cir. 1969).

To the extent that there may occasionally be material unfavorable to a defendant in the motion papers, the principle of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), may protect a defendant against its use at a trial.

The Clerk may require copies of the motion for both the District Attorney and the defense counsel, but he should proceed more promptly than has been the past practice.

If the relief given to Legal Aid by this decision results in more frequent communication with incarcerated defendants and reduces the need for *pro se* motions, defendants may seek modification of the order to be entered.

### Control of the Calendar

It is not disputed that the Supreme Court Justices have legal power now to control the calendars in each Part. The efficacy of an order requiring that jail cases be tried in chronological order, a practice already mandated by New York statute, is uncertain. Any order would have to permit deviations for good cause shown, which would be difficult for a federal court to enforce, and might require daily intrusion into the functioning of the state court.

There is evidence that the matter of calendar control is under active consideration at various levels of the Judicial Conference. A recent case quotes the District Attorney as determined to try jail cases in order of indictment numbers. People v. Ryan, 72 Misc.2d 990, 991, 340 N.Y.S.2d 321 (Sup.Ct. Kings Co. 1973). Immediate amelioration of the additional burden placed on Legal Aid because a fixed order on the calendar is not followed can be achieved by cooperation between the Judge, the Assistant District Attorneys, and the Legal Aid attorneys in the Parts.

For the present, the complexity of the problem and the corrective steps envisioned by the Judicial Conference dictate that the court abstain from any action on this issue.

### Other Parties

Since the assignment of Legal Aid attorneys in Supreme Court requires a step separate from their appointment in the Criminal Court, it does not appear to be necessary or appropriate to issue any injunction against assignments by Criminal Court Judges at this time.

Granting an injunction against Supreme Court Justices would involve an unusual exercise of federal court power. If Legal Aid is enjoined from accepting assignments in excess of its capacity to provide effective representation, it is fair to assume that Justices of the Supreme Court will not force Legal Aid to disregard this court's injunction. Under the circumstances, it does not appear to be necessary or appropriate to issue any injunction against the Supreme Court Justices at this time.

The relief sought against the District Attorney relates only to calendar control, a matter on which the court has abstained for the present. Therefore, no relief will be granted at this time against the District Attorney.

The State of New York is named in the caption of the McLaughlin actions, but no showing has been made that this case involves an exception to the Eleventh Amendment prohibition of suits against a state. The state is considered not to be a party to the action.

The City of New York is a defendant in the McLaughlin actions, but no relief is asked against the City in the first and second causes of action. The Corporation Counsel was present at the beginning of the Wallace hearings as attorney for the BHD Warden and was present at most of the other hearings. No direct relief will be granted against the City in the injunction order.

The City will be affected by the injunction to the extent that representation of defendants by 18–B attorneys may cost more than their representation by Legal Aid. The court is satisfied that adequacy of legal representation must be determined by the attorney (Legal Aid) and not by the City's budgetary officers, and that indigents may not be deprived of proper representation because of the contract under which Legal Aid operates.

As Judge Kaufman has recently pointed out (Prison: The Judge's Dilemma, 41 Fordham L.Rev. 495, 516—1973), enforcement of constitutional rights requires that "the public [be] willing to pay the price of reform, and to commit adequate funds." Allocation of sufficient resources is necessary not only to assure fair treatment for those accused of crime, but also to make the criminal justice system work to the benefit of all. One of the primary functions of the system is to protect society against violence and crime. If the criminal courts are left to founder for want of public support, there is a real danger that crime will go undeterred.

The fact that the injunction to be granted will run only against The Legal Aid Society and the Court Clerks does not indicate any allocation of culpability, but merely a determination of the most practicable way, consistent with a federal court's limited powers and in the interest of comity with state courts, to remedy two of the deficiencies which led a Legal Aid executive to testify, as quoted earlier, that "The system isn't working."

An order in conformity with this memorandum is being signed simultaneously, subject to modification in any respects that may prove necessary. The plaintiffs being presumptively indigent, and having their liberty at stake, should not be required to post any bond as a condition of the injunction.