UNITED STATES of America ex rel.
Robert E. LEE, Jr.,
# C–08131, Petitioner,

v.

Charles ROWE, Director, Department of Corrections, State of Illinois and Neal MacDonald, Warden, Sheridan Correctional Center, Respondents.

No. 77 C 3127.

United States District Court,
N. D. Illinois, E. D.

March 2, 1978.

Mary Robinson, Deputy State App. Defender, Daniel Cummings, Asst. State App. Defender, Randy K. Johnson, Senior Law Student, Elgin, Ill., for petitioner.

William J. Scott, Atty. Gen., for the State of Illinois, Kenneth A. Grnacek and Mark L. Rotert, Asst. Attys. Gen., Chicago, Ill., for respondents.

MEMORANDUM OPINION

MAROVITZ, District Judge.

*Motion and Cross-Motion for Summary Judgment*

Petitioner Robert E. Lee, Jr., was convicted of murder before a jury on February

22, 1971 and sentenced to twenty-five to fifty years imprisonment. Upon appeal, his conviction and sentence were affirmed by the Illinois Appellate Court. *People v. Lee*, 7 Ill.App.3d 320, 287 N.E.2d 191 (2d Dist., 1972) (hereinafter, *Lee I*). On August 24, 1973, Lee unsuccessfully petitioned the Circuit Court of DuPage County for post-conviction relief in the form of a new trial. The court denied him relief on February 24, 1975 and was affirmed on appeal. *People v. Lee*, 43 Ill.App.3d 807, 2 Ill.Dec. 485, 357 N.E.2d 652 (2d Dist., 1976) (hereinafter, *Lee II*). Lee's petition for leave to appeal was denied by the Illinois Supreme Court. 361 N.E.2d No. 3, XXVIII (1977).

Petitioner brings this petition for a Writ of *Habeas Corpus*, alleging the same errors which he had raised at his post-conviction hearing and appealed to the state courts. The jurisdiction of this Court is invoked under 28 U.S.C. § 2254. There is no dispute that petitioner exhausted all available state remedies.

Petitioner advances three issues for review. He first claims that he was denied his right to effective assistance of counsel, as guaranteed by the Sixth Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution, when his counsel failed to investigate grounds for or raise an insanity defense after facts supporting such a defense were brought to his attention before trial. His second claim is that he was denied effective assistance of counsel when counsel failed to request a hearing to determine Lee's fitness to stand trial after facts which allegedly indicated the propriety of such a hearing were brought to counsel's attention. He finally claims that he was denied a fair trial, as guaranteed by the due process clause of the Fourteenth Amendment, when the trial court failed to hold *sua sponte* a fitness hearing when evidence allegedly sufficient to raise a reasonable doubt of Lee's competence was brought to the court's attention.

Pending before this Court are respondent's motion for summary judgment and petitioner's cross-motion for summary judgment. Rule 56, F.R.Civ.P. For the reasons set forth below, respondent's motion is denied and petitioner's motion is granted.

The facts concerning petitioner's murder conviction are set out in *Lee I*. At his criminal trial, petitioner relied upon alleged bruises found on his person at the time of his arrest as evidence that he had fought with the decedent. Consequently, he had advanced a self-defense theory, which was apparently rejected by the jury.

The facts supporting the issues petitioner raises here are set out in part in *Lee II*. Relevant to the pending motions is the evidence adduced at petitioner's post-conviction hearing, which detailed petitioner's medical and psychological history.[1]

Dr. Albert J. Simon, a physician practicing in Elgin, Illinois, testified that he first examined Lee in July, 1961 (R. 7). He examined Lee again on December 26, 1961, when he signed a physician's certificate for commitment of Lee to Elgin State Hospital (R. 9). Simon diagnosed Lee's condition as simple schizophrenia (R. 12–19). A report of a physician's commission in Cook County, Illinois, dated December 29, 1961, indicates that Lee showed no evidence of psychosis (C. 266). Lee's mother attempted to have him committed to the Cook County Hospital Mental Health Clinic on December 26, 1961 (C. 261).

On March 10, 1962, Lee was admitted to Elgin State Hospital with a diagnosis of sociopathic personality disturbance with chronic alcoholism (C. 273–275). On March 15, 1962, Lee was ordered committed by a state court (C. 277). Lee was discharged on March 31, 1962, with a finding that he was absolutely without psychosis (C. 278–279).

Lee was treated on an out-patient basis by a Dr. Engels on August 8, 1965. Engels diagnosed him as having a sociopathic personality without any psychotic manifesta-

---

1. As in the parties' memoranda, citations of (R.___) are citations to the transcript of the post-conviction hearing. Citations of (C.___) are citations to the common-law record at the post-conviction stage.

tions (C. 284). However, Engels recommended the following:

Patient is not amenable for out-patient therapy; commitment to a psychiatric facility was recommended. *Patient has definite homicidal trends and is a homicidal risk. There is a probability of eventual life imprisonment or death facing this patient, if his present pattern of behavior continues.* (C. 284) (emphasis added).

Engels prescribed the drug Dilantin for Lee, "to assist him in controlling his rage." (C. 284).

Petitioner's wife, Sue Lee, testified about a number of incidents which occurred during their marriage (R. 122–130). Particularly relevant are episodes to which she testified occurring from 1968 to 1970. During that period, Lee suffered from a number of memory lapses (R. 135). Lee exhibited violent behavior on occasions, and could not remember the occurrences shortly afterward (R. 135–137). On at least two occasions, Lee attempted to murder his wife, once with an ax while she was asleep. Lee could not remember either episode shortly after they had occurred. (R. 138–141).

Michael C. Sabo, a clinical psychologist at the Janet Wattles Mental Health Center, testified that he spoke to petitioner on July 29, 1970 (R. 37). The result of tests administered to Lee by Sabo and other members of the staff indicated that petitioner suffered from latent schizophrenia (R. 43). Sabo explained what he had meant by the term:

Latent meaning a strong possibility that Mr. Lee is unstable to the point where he is very unpredictable. There are times when he is not in good contact with reality. If you want me to be really specific, he comes to us at the Mental Health Clinic with a depressive feature. That is, he is turning anger upon himself, is riddled with guilt, very anxious, strong sociopathic component. It is questionable about his loyalties that he is anyone other than himself, erratic, prone to rage one minute, remorse another. Life may consist of patterns to where for a period of

time he might function very well, then he might blow up in irresponsible fashion, injure himself or others, then a period of remorse, possible depressive features, etc. Life goes in patterns, in cycles (R. 46).

Sabo also stated that Lee might be a moderate to chronic alcoholic and that the alcoholism could trigger the schizophrenia (R. 47–49). Sabo felt that Lee would fit into the category of a split personality (R. 68) and that a person so suffering may incur memory lapses (R. 70).

Lee's trial counsel testified at the post-conviction hearing that he was aware of a report by a Dr. Stiller, dated August 11, 1970, diagnosing petitioner as suffering from a schizophrenic reaction with symptomatic alcoholism (R. 210).

On August 14, 1970, a state court ordered petitioner to be released from the custody of Elgin State Hospital (C. 306). However, it is apparent that the state court did not have in its possession the report of Dr. Stiller, received by the state court on August 20, 1970, which suggested that Lee was in need of mental treatment and that he should "be hospitalized in a suitable public or private hospital." (C. 308).

The murder for which petitioner was convicted occurred on October 24, 1970, little more than two months after Lee was diagnosed as suffering from mental illness. At the post-conviction hearing, Lee's wife recounted the day of petitioner's arrest, October 25, 1970:

Bob came home. It was still dark but almost daylight when he came home. I had left the back door open, and he came in and he went into the living room and he just sat in the chair. I got up and I went out there and he was just sitting there. I spoke to him, but he didn't answer, so I left him alone because I was mad. I was you know upset. I didn't know. I thought, "Well sure things are going to start up all over again," after they had been so much better. (R. 147). Then I went back to bed, and I don't know how much later, but he came back to bed. It was starting to get light out when he came back to bed. I didn't say

anything to him, and I got up with the children and I got them dressed and I sat down and then Bob got up. Then our little boy, who was two then, asked, "Daddy, what happened?" He had scratches on his face and he had marks on his throat and he had asked what had happened and daddy said, "I don't know." I said well you must have been in a fight. Daddy was in a fight with someone. Then they went out to play, and I asked Bob, I said, "Well, what happened?" He said, "I don't know." (R. 148). He said he didn't know, and he said he had no idea where he was, or anything. I said, "Why didn't you come home when you called me from Dale's yesterday?" He said, "I called you from Dale's," I said, "Yes, twice, and you said you were going to be home." He said, "I don't even remember being at Dale's." Then he went back to bed, and then shortly after that, around 1:00, 2:00, something like that, the police came. (R. 149).

Defense counsel, an experienced attorney (R. 187–189), was appointed to represent Lee after his arrest (R. 149). The post-conviction hearing disclosed what information defense counsel was aware of at the time of the trial.

Mrs. Lee testified that she told defense counsel before trial that petitioner had been to Elgin State Hospital, that he had recently been released in August, and that he had also spent time in the Janet Wattles Clinic (R. 153). Counsel admitted that he had interviewed Lee's wife and mother:

Q. [By Defense Counsel Lee Daniels]: Okay. Now, did you have any meeting with Mrs. Lee, the wife of the defendant, prior to the trial or before the trial? (R. 202)

  *    *    *    *    *    *

THE WITNESS: Yes, I met with his wife and his mother several times prior to trial.
I believe on several of the occasions his sister-in-law was also present.

Q. Isn't it true that at one of these meetings with his wife she told you about a rather extensive medical background, history, as far as mental problems that Mr. Lee had suffered from?

  *    *    *    *    *    *

THE WITNESS: My recollection—I did refresh my recollection from my notes, and my recollection on that is that discussion came from his mother.
Now, I was advised by either the defendant, his wife, or mother that he had been hospitalized both at Elgin and Mercyville.
He also told that to the staff investigator on the first interview. (R. 203).

Petitioner's hospitalization was reflected on his FBI criminal record report. Defense counsel testified that he was not sure whether he had seen it prior to trial. (R. 204). He believed that he had received records from Elgin Hospital after petitioner's conviction but before his sentencing hearing (R. 204). Counsel also received Dr. Engels' report:

Q. [By Mr. Daniels]: I show you Group Exhibit No. 8, which has been introduced into evidence, and ask you if you recall at any time seeing Dr. Engels' diagnostic evaluation.

A. Yes, I did.

Q. That was prior to sentencing. Is that correct?

A. Yes.

Q. In reviewing that, do you recall the diagnosis?

A. Yes, I do.

Q. What was the diagnosis?

A. The patient is considered to be a definite potential homicidal risk. Unless the above can be accomplished, his ultimate fate will probably be life imprisonment or death from police or other intervention (R. 211).

Defense counsel stated that he did not believe that he made any effort to procure medical records prior to trial (R. 206). It is also evident that counsel did not attempt to

procure reports after petitioner's conviction, which could have been made the basis for a motion for a new trial (R. 211, *supra*). George Fick, a probation officer for Du-Page County, was assigned by the court to make Lee's probation study (R. 79). He had asked Lee for medical releases which Lee would not sign until he had consulted with defense counsel (R. 93–95). Fick asked defense counsel to have Lee sign the release forms but counsel never got the requested medical information release forms over to him (R. 96). Counsel's own testimony corroborated Fick's:

Q. [By Mr. Daniels]: Did you make any effort to procure records, medical records, of Mr. Lee prior to the trial, before the trial?

A. I don't believe I did.

Q. Did you ask him to sign any consents at any time before the trial for the release of the medical records?

A. I have no recollection. It is entirely possible I did not. (R. 206).

Defense counsel's statement on redirect examination by the state summarized the testimony set out above:

Q. [By Mr. Nosek]: The question, Mr. Wesolowski, was, did you consider the *possibility* of presenting an insanity defense?

A. I would have to say probably not. (R. 216) (Emphasis added).

After reviewing the evidence described above, the state court which presided over petitioner's post-conviction hearing stated the following:

THE COURT: I have reviewed all of the cases that have been submitted.

I have reviewed the exhibits and I have read at least portions of the transcript that has been entered into evidence in this case.

The Court finds that there is no question but what [sic] this petition presents a constitutional question that should be subject to investigation and hearing of evidence in making a determination pursuant to the provisions of the Post Conviction Hearing Act.

As I read the cases, the issue that is before the Court is, has the defendant created a bona fide doubt as to his competency at the time of trial, which was February of 1971. That is the issue before the Court. Now, also the defendant raises an issue in reference to the competency of the attorney who represented him at trial in February of 1971.

As to that issue, the Court finds that he was represented by a competent attorney, one with considerable experience in criminal matters, and there is nothing the Court sees in the record which indicates he was not given an excellent representation by Mr. Wesolowski.

So that disposes of that issue. (R. 236–237)

On appeal, the Illinois Appellate Court rejected petitioner's claim of ineffective assistance of counsel:

"In view of the above it is obvious that the trial strategy of defense counsel was that of self defense, even though he had been advised of the alcoholic addiction of the defendant and his commitment to the Elgin State Hospital. It is also obvious that there was no indication to defense counsel that the defendant was incompetent either at the time of trial or at the commission of the offense. It is also to be noted that there was no evidence of any examination or commitment of the defendant for a period of five years prior to the time of the murder herein." *Lee II, supra,* at 357 N.E.2d 655.

#### I.

At the outset, the Court is presented with questions of comity and the orderly maintenance of federal/state relations in determining whether it is proper for this Court to disturb the conclusions of law of the state courts.

The state argues that the state court determination of the issues petitioner raises was a ruling on the constitutional merits of a factual dispute and evidenced by an adequate written record. See Ill.Rev.Stat. (1975) ch. 38, § 122–1. Accordingly, petitioner must establish that the state court

ruling was erroneous. *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

In *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1962), the Supreme Court wrote:

> Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's finding of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas.

In *LaVallee v. Delle Rose, supra*, the Court stated:

> [a]lthough it is true that the state trial court did not specifically articulate its findings, it can scarcely be doubted from its *written* opinion that [petitioner's] factual contentions were resolved against him. 410 U.S. at 692, 93 S.Ct. at 1204. (emphasis added).

We note that neither party challenges the findings of fact by the post-conviction trial court. The gravamen of petitioner's claim is that the state courts misapplied the constitutional standard of inadequate representation to the evidence that was adduced at the post-conviction hearing. It is that issue which this Court is obliged to address.

The post-conviction hearing court did not render a written finding of facts in this case. More important, however, is the fact that the state court did not actually decide "the constitutional claim tendered by the [petitioner] on its merits." *Townsend v. Sain, supra*, 372 U.S. at 314, 83 S.Ct. at 757. The oral opinion of the post-conviction court simply did not address petitioner's claim that he was denied effective assistance of counsel by counsel's failure to investigate facts which may have indicated the propriety of raising an insanity defense. Rather, the court rested its findings solely on the record of Lee's criminal trial. From the record, and the court's knowledge of counsel's experience in criminal matters, the court concluded that Lee was "given an excellent representation" by defense counsel. However, as discussed *infra*, that analysis is insufficient to determine whether counsel's pretrial investigation was adequate.[2] See *Brubaker v. Dickson*, 310 F.2d 30, 32 (9th Cir. 1962).

## II.

Illinois ascribes to what is commonly referred to as the American Law Institute Model Penal Code rule to determine the merits of an insanity defense. Compare Ill.Rev.Stat. (1972) ch. 38, § 1005–1–11 to *Model Penal Code* § 4.01 (proposed official draft, 1962). See Note, Illinois Fitness for Trial: Processes, Paradoxes, Proposals, 6 *Loyola L.J.* 678, 679 n. 7 (1975). For a finding of not guilty by reason of insanity, it must be shown that the criminal defendant "lack[ed] the substantial capacity either to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law as a result of mental disorder or mental defect." Ill.Rev.Stat. (1972) ch. 38, § 1005–1–11.

Petitioner contends that he was denied effective assistance of counsel because his public defender not only failed to raise insanity as a defense, but totally failed to investigate facts which may have supported an insanity defense.

The record indicates that defense counsel was aware of some fragments from petitioner's history of mental commitments and hospitalization prior to trial. The record also shows that counsel never made an effort to procure petitioner's medical records before or after trial and before sentencing. One report on petitioner, which diagnosed him as suffering from a schizophrenic reaction with symptomatic alcoholism as late as August 11, 1970, was apparently ignored by

**2.** It is also apparent that the post-conviction trial court would necessarily have applied a standard for ineffective assistance of counsel that was substantially altered by the Seventh Circuit Court of Appeals six weeks prior to the disposition of petitioner's motion for a new trial. Compare *People v. Goerger*, 52 Ill.2d 403, 288 N.E.2d 416 (1972) with *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975).

defense counsel. It is also clear from the record that counsel did not consider an insanity defense, and did not move for a new trial once additional evidence of a mental defect came to light prior to petitioner's sentencing.

It is well settled that the Sixth Amendment guarantees a criminal defendant the right to counsel and the right to effective counsel. *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 n. 14 (1970) and cases cited therein; *United States ex rel. Williams v. Twomey, supra; United States v. DeCoster*, 159 U.S.App. D.C. 326, 487 F.2d 1197 (1973). Effective assistance of counsel not only includes counsel's presentation of his or her client's case at trial, but encompasses counsel's pretrial investigation and preparation. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *United States ex rel. Williams v. Twomey, supra.*

In *Brubaker v. Dickson*, 310 F.2d 30 (9th Cir. 1962), for example, the court stated:

When inadequate representation is alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy. 310 F.2d at 32 (footnote omitted).

In the landmark decision of *Powell v. Alabama, supra*, Mr. Justice Sutherland wrote:

In any event, the circumstance lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid

during that period as at the trial itself. 287 U.S. at 57, 53 S.Ct. at 59.

In the Seventh Circuit, a criminal defendant has been held to have a "constitutional right to an advocate whose performance meets a minimum professional standard." *United States ex rel. Williams v. Twomey, supra*, 510 F.2d at 640; *United States v. Brugger*, 549 F.2d 2, 4 (7th Cir. 1977).

The question before this Court, therefore, is whether defense counsel's total failure to investigate facts which may have supported an insanity defense, brought to his attention before trial, amounted to legal representation below minimum professional standards. We hold, on these facts, that defense counsel's pretrial investigation was below the minimum professional standard.

In *Andrews v. United States*, 403 F.2d 341 (9th Cir. 1968), the trial court elicited the fact that the criminal defendant had been receiving disability payments because he was suffering from *dementia praecox* due to certain head injuries and alcohol related problems. The Ninth Circuit reversed defendant's conviction, finding that counsel's pretrial investigation fell below minimum constitutional standards, and stated:

He made no pretrial inquiry into appellant's disability, though reason for inquiry had been fairly presented to him . . . He did not move, then or thereafter, for an inquiry into appellant's competency to stand trial, or his mental capacity to commit the offense, although the necessity for such inquiry was obvious. 403 F.2d at 343–344.

In *Brubaker v. Dickson, supra*, the court appointed defense attorney failed to investigate defendant's history of mental illness, seizures and alcoholic instability. Psychiatric opinion based upon a post-conviction evaluation of the defendant disclosed that while defendant was "not 'insane,' [he] had a compulsive personality marked by strong emotional instability . . . [and] hypersensitivity to alcohol . . . ." · 310 F.2d at 33. The Ninth Circuit granted *habeas corpus* relief because the defendant was inadequately represented, stating:

Trial counsel was aware of appellant's history of head injury and extended unconsciousness and of the heavy drinking that occurred on the night of the homicide. Nonetheless, he made no effort to elicit appellant's personal history, made no inquiries of appellant's family, friends or employers (although furnished the names by appellant), and failed to arrange a private examination of appellant by an independent psychiatrist (although funds were available for that purpose), because he mistakenly supposed that the communications would not be privileged. 310 F.2d at 35 (footnotes omitted).

As in *Brubaker*, Lee's defense counsel was aware of Lee's history of mental illness and the drinking that took place on the night of the murder. See *People v. Lee, supra*, 287 N.E.2d at 192. As in *Andrews*,

the necessity for an inquiry into Lee's psychiatric history was obvious. Investigation into the information that was before defense counsel prior to trial, brought to counsel's attention by his interview of Lee's wife and mother and reports of Lee's past and recent psychological examinations, would have at least led counsel to the evidence of Lee's psychological problems that was adduced at his post-conviction hearing. Certainly, Dr. Engels' prophetic diagnosis, that Lee "has definite homicidal trends and is a homicidal risk" and that Lee faced "a probability of eventual life imprisonment or death" (C. 284), should have struck a responsive chord in even an inexperienced attorney's mind. Since *mens rea* is a critical element of a murder charge, counsel's failure to pursue that line of investigation is as gross as a failure to interview known witnesses to the occurrence of the crime.[3]

3. On February 27, 1978, subsequent to the time this opinion had been drafted for rendering on March 2, 1978, petitioner, through counsel, moved to cite additional authority. Petitioner brings to the attention of this Court the recent decision in *Springer v. Collins*, 444 F.Supp. 1049 (D.Md.1977). While a decision from the District Court of Maryland is only persuasive authority outside the Fourth Circuit, the factual similarity of *Springer* to the case at bar and the reasoning which the *Springer* court applied to those facts merit some discussion.

The petitioner in *Springer* had been charged with statutory rape. He had retained an attorney who had practiced in the county where Springer was tried for fourteen years. Springer told defense counsel that he was "messed up" at the time the crime occurred. Counsel was aware of Springer's drug use during the period leading up to the incident.

While counsel obtained the hospital records pertaining to the diagnosis and treatment of Springer subsequent to the incident, he did not attempt to talk to any medical personnel involved. At trial, counsel sought to raise doubt as to Springer's intent to commit the crime in light of evidence of Springer's intoxication. He did not raise nor investigate an insanity defense. Springer was convicted.

At his post-conviction hearing, Springer presented some psychiatric testimony that he had been insane at the time of the rape. The psychiatrist who testified on his behalf apparently based his opinion on Springer's "unstable personality, his family history, his father's problems with alcohol, his own long standing drinking problem, his daily heavy use of drugs and alcohol for two years prior to the incident, his recurrent amnesia, and his disoriented be-

havior at the time of the incident." 444 F.Supp. 1049, 1054.

Citing *Wood v. Zahradnick*, 430 F.Supp. 107, 111–112 (E.D.Va.1977) appeal docketed, No. 77–1627 (4th Cir. 1977), in which Judge Merhige wrote that "[w]here . . . the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, counsel has an affirmative obligation to make further inquiry . . .," the *Springer* court held that the petitioner was denied effective assistance of counsel.

The facts in the case at bar are even more compelling for the issuance of *habeas corpus* relief than the facts in *Springer*. Unlike Springer, who had no history of psychiatric treatment, petitioner Lee has a long history of treatment and diagnosis. Further, the *Springer* court relied heavily on the fact that the petitioner was charged with a very serious crime, statutory rape. Petitioner Lee was charged and convicted of murder. In addition, Lee exhibits the same memory lapses, problems with alcohol and disoriented behavior at the time of his crime that were described in *Springer*. Like Springer, Lee's defense counsel is experienced.

Judge Kaufman's language in *Springer* succinctly reflects the sentiment of this Court:

"While 20–20 hindsight is always better than foresight and there can be no certainty that one or more psychiatrists would have testified at Springer's trial in accord with the opinion of [the psychiatrist at the post-conviction hearing] expressed in this case, and of course no certainty that an insanity defense would have been successfully asserted at trial, Springer's trial counsel's failure to discuss

As the court stated in *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir. 1968): "Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial." See also *Goodwin v. Swenson*, 287 F.Supp. 166, 176 (D.Mo. 1966) ("An accused's right to effective assistance obviously is not limited to the courtroom. His counsel must make reasonable investigation of the facts . . . ."). Lee's counsel simply did not make a reasonable investigation of the facts.

This conclusion does not imply that the remainder of counsel's investigation or conduct at trial was below minimum standards. To the contrary, our perusal of the trial record indicates that counsel's trial conduct was more than competent. We therefore agree with the post-conviction hearing court that petitioner had been, at least in one respect, represented by able counsel.

We depart from the reasoning of that court, however, and the court which affirmed its decision, on the question of whether counsel's failure to *raise* an insanity defense was simply a strategic choice. It is clear that counsel could not have made a choice between two plausible defenses, i. e., insanity and self defense, because counsel did not have sufficient information, although available, on which to base an intelligent decision. As a practical matter, when deciding whether to present an insanity defense, the criminal defendant's lawyer is truly the final psychiatrist. It is not the role of a court to doubt his judgment. But here, it cannot be said that counsel ever made a judgment.

In the words of Chief Judge Bazelon of the District of Columbia Court of Appeals:

"This court does not sit to second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed because of inadequate preparation, a defendant is denied

the effective assistance of counsel. The present record, as is typical in cases raising a claim of ineffectiveness, poses more questions about counsel's preparation and investigation than it answers." *United States v. DeCoster, supra*, 159 U.S.App. D.C. at 330, 487 F.2d at 1201 (footnotes omitted).

Petitioner is correct in his contention that this Court cannot consider whether he would be successful in his presentation of an insanity defense. As the Supreme Court stated in *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." While we have no opinion on the merits of petitioner's possible insanity defense, we do consider its plausibility to determine whether defense counsel was remiss in his failure to investigate the defense. Here, the evidence indicates that some investigation may have disclosed a plausible defense, regardless of the defense's potential for success.

We are aware that the Illinois Appellate Court did consider the merits of petitioner's insanity claim and found that the record did not disclose "any evidence that defendant was insane at the time of the commission of the offense . . . ." *Lee II*, 2 Ill.Dec. at 489, 357 N.E.2d at 656. Without further expressing an opinion on the propriety of that consideration, we note that the court was apparently unaware of any examination or commitment of petitioner for a period of five years prior to the time of the murder. 2 Ill.Dec. 488, 357 N.E.2d 655. The record before this Court, however, does disclose a psychiatric report made two months prior to the murder (R. 37, R. 210, C. 308), along with evidence that petitioner acted in violent manner toward his wife on a number of occasions between 1968 and 1970, without remembering the incidents shortly after they had occurred.

same with his client and to explore the possibility of advancing an insanity defense was outside the range of competence expected of him as a defense attorney in a criminal case

involving a very serious charge." 444 F.Supp. at 1065.

We therefore find support for the decision in the case at bar from *Springer v. Collins, supra*.

### III.

 The State urges that even if petitioner's legal representation was constitutionally inadequate, this Court should deny *habeas corpus* relief because the error was harmless beyond a reasonable doubt since petitioner can show no prejudice which resulted from counsel's inadequate pretrial investigation. *McQueen v. Swenson*, 498 F.2d 207, 218 (8th Cir. 1974). See generally, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We disagree.

In *United States ex rel. Healy v. Cannon*, 553 F.2d 1052 (7th Cir. 1977), the Court recently stated that "the harmless error doctrine is patently inapplicable to the claimed deprivation of a due process right so fundamental as the effective assistance of counsel." 553 F.2d at 1057 n. 7, citing *Glasser v. United States, supra; Gideon v. Wainwright*, 372 U.S. 335, 340–344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Chapman v. California, supra*, 386 U.S. 18, 43, 87 S.Ct. 824, 17 L.Ed.2d 705 (Stewart, J., concurring).

 To summarize, we hold on the facts of this case that petitioner was denied effective assistance of counsel. In closing, however, we feel it necessary to clarify what this holding does not entail. We do not hold that every state prisoner whose defense counsel failed to investigate an insanity defense is entitled to a new trial. Rather, we hold that where minimal investigation into facts which were already known by defense counsel could have disclosed a viable insanity defense, a criminal defendant is denied adequate representation if counsel totally fails to investigate those facts for no articulable reason.

### IV.

In light of the foregoing disposition, the Court need not address petitioner's claims that counsel and the trial court erred by failing to raise or hold a hearing to determine his fitness to stand trial.

Accordingly, respondent's motion for summary judgment is denied. Petitioner's cross motion for summary judgment is granted.

We therefore order that petitioner is entitled to the relief prayed for but that the writ of *habeas corpus* shall not issue for a period of one-hundred twenty (120) days in order to afford the State of Illinois the opportunity to initiate new trial proceedings. If such trial proceedings are not begun within one-hundred twenty (120) days from the date of this order, the writ shall issue.